970 F.Supp. 1440 (1997)
Larry B. STANFIELD, Plaintiff,
v.
Shirley S. CHATER, Commissioner of Social Security, Defendant.
No. 1:95 CV 103 DDN.
United States District Court, E.D. Missouri, Southeastern Division.
April 11, 1997.
*1441 *1442 *1443 Eileen Kinney, Kinney Law Firm, P.A., Minneapolis, MN, for Plaintiff.
Eric Tolen, Office of U.S. Atty., St. Louis, MO, for Defendant.

MEMORANDUM
NOCE, United States Magistrate Judge.
This judicial action is before the court upon the cross-motions of the parties for summary judgment under Federal Rule of Civil Procedure 56. The parties have consented to the exercise of jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

Procedural history
Plaintiff Larry B. Stanfield has filed numerous applications for benefits under the Social Security Act ("Act"). On January 20, 1988, plaintiff filed applications for disability insurance benefits under Title II of the Act, 42 U.S.C. § 401 et seq., and for supplemental security income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq.[1] Plaintiff was found not to be disabled by an initial determination on March 16, 1988, and after reconsideration on April 28, 1988. (Tr. 171, 176-80.) Subsequently, plaintiff asked for a hearing but, through his attorney, withdrew his request. (Tr. 156-57.)
On February 21, 1989, plaintiff filed concurrent applications under Titles II and XVI (Tr. 211-20), which were denied initially on April 3, 1989, and not further pursued. (Tr. 186-90.)
On July 17, 1989, plaintiff filed new applications for Title II and Title XVI benefits (Tr. 252-55, 263-65), which were denied initially on August 9, 1989, and after reconsideration. (Tr. 221-25, 238-42, 258-59, 261-62.) A hearing was held before the ALJ on April 24, 1990. (Tr. 50-77.) On July 24, 1990, the ALJ issued a decision finding that plaintiff was not under a disability as defined by the Act. (Tr. 389-94.) On April 30, 1991, the Appeals Council granted plaintiff's request for review of the ALJ's unfavorable decision and remanded his claims, stating that the record contained insufficient evidence regarding plaintiff's mental status. The ALJ was instructed to obtain a mental *1444 status examination, with psychological testing and a medical assessment; to complete a new Psychiatric Review Technique Form; and, should it be determined that he could not perform his past relevant work due to his nonexertional limitations, obtain the testimony of a vocational expert. (Tr. 372-73.) A supplemental hearing was scheduled for December 11, 1991. (Tr. 414.) Before that date, plaintiff wrote a letter asking that counsel be appointed to represent him. He stated that he wanted to keep the date that had been set. At the end of the letter, he stated that "[y]our office can make whatever decision you want." (Tr. 412-413.) On November 26, 1991, the ALJ wrote plaintiff, stating that plaintiff's letter had indicated he would not be attending the hearing. He told plaintiff to sign an enclosed form indicating that he wished an on-the-record decision. The ALJ warned plaintiff that if he failed to return the form or appear at the hearing, his request for hearing would be dismissed. (Tr. 414.) Plaintiff subsequently refused to attend a consultative medical examination and also failed to appear at the hearing or return the form. His claim was dismissed on December 20, 1991. (Tr. 415-16.)
On February 4, 1992, plaintiff filed new applications for Title II and Title XVI benefits. (Tr. 513-515.) In his Title II application, plaintiff alleged that he became disabled on February 1, 1983, at age 41.[2] (Tr. 513.) He complained of a cracked spine and chest pains. (Tr. 489.) In his Title XVI application filed that same day, plaintiff alleged that he became disabled on July 3, 1985, at age 43, due to a cracked spine (the result of either a parachute jump or a fall down the stairs). (Tr. 323, 442, 471.) Plaintiff's applications were denied initially[3] and on April 15, 1992, after reconsideration. (Tr. 507.) A hearing was held on July 14, 1992. (Tr. 78-127.) On January 27, 1994, the ALJ issued a decision finding that plaintiff was not under a disability as defined by the Act. (Tr. 584-96.)
Plaintiff requested review of the ALJ's decision and on July 22, 1994, the Appeals Council granted the review and remanded the case to the ALJ for consideration of the transferability of plaintiff's skills, for clarification of whether he had a medically determinable mental impairment for the period through September 30, 1986, and for clarification on whether the ALJ accepted the July 1992 MMPI results as valid. (Tr. 578-81.) On January 12, 1995, a supplemental hearing was held. (Tr. 128-155.) On March 11, 1995, the ALJ issued a decision finding that plaintiff was not under a disability as defined by the Act. (Tr. 23-37.) Plaintiff appealed the decision and on June 16, 1995, the Appeals Council, after considering additional evidence (Tr. 646-62), denied plaintiff's request for review of the ALJ's decision. (Tr. 6-9.) Thus, the March 11, 1995, decision of the ALJ stands as the final decision of the Commissioner.

Evidence Before the ALJ

Education and employment background
At the time of the January 12, 1995, supplemental hearing upon remand, plaintiff testified that he was 53 years old. (Tr. 138.) Plaintiff has a high school education, and he has worked as a plumber and as a maintenance and repair person. (Tr. 273-74, 289, 493.) He has reported several times that he has completed several years of college-level classes. (Tr. 132, 200.)
Plaintiff told psychiatrist T.J. Glenn in April 1988 that he last worked at the Lakewood Country Club in Texas in 1984, working as a maintenance person for three to six months. He stated that it was during this time that he and his wife were having problems, so he quit working. (Tr. 199.) He stated that he had not worked since that time, except for day work whenever possible. (Id.)
Plaintiff testified at the April 24, 1990, hearing that he is a high school graduate, *1445 with additional training in plumbing and air conditioning repair. (Tr. 56.) He stated he has not worked since 1985. (Tr. 56.) At his July 14, 1992, hearing, he said he has two years of college. (Tr. 83.) In regard to his work history, plaintiff testified he last worked in Texas in 1985 maintaining the plumbing, heating and cooling systems in an apartment complex. (Tr. 86, 87.) He was fired because the "Employees of the VA Hospital in Poplar Bluff, Missouri, come down there and acquired a job, working down there where I was working, and they fired me." (Tr. 88.) He also said, "I was fired because it was a VA Hospital and T.G. Glenn at ... the VA Hospital in Poplar Bluff." (Tr. 89.) "These people seem to have made my life a personal conflict of theirs." (Tr. 89.)
Plaintiff also testified that after he was fired from his job in Texas, he went to California. (Tr. 115, 116.) He stated that "This bunch from the VA Hospital and Channel 12 and some of their college students ... stole my van out there." (Tr. 116.) He further said that he met Maria Shriver and that she got him "a couple small jobs out there." (Tr. 116.) He worked for a company for about four or five weeks that made coin changers checking the machines to make sure they were functioning right. (Tr. 116, 117.)
At the January 12, 1995, hearing, plaintiff testified he had three and a half years of college. (Tr. 132.) He majored in business management but did not obtain a degree. (Tr. 132.) His past work included work as a machinist for Missouri Dry Dock, specifically as a specialist for river boats. (Tr. 134.) Plaintiff also testified that he worked for real estate developers, repairing commercial and home air-conditioning units and plumbing. (Tr. 135, 136.) In regard to the plumbing, he stated he had to read blueprints and schematics. (Tr. 136.)

Plaintiff's daily activities
In regard to his activities of daily living, plaintiff testified he gets up at 7:00 a.m., eats three times a day, has a good appetite and is able to take care of his personal needs. (Tr. 92.) He likes to cook, he washes dishes, mows the yard and gardens. (Tr. 93.) In the evening, he turns on the TV to a country music station to listen to music while he reads business magazines. (Tr. 91-94.) He usually retires at 10:00 p.m. (Tr. 92.) Plaintiff also testified he does not drive much because it hurts his back. (Tr. 67.) He likes fishing and hunting but has not gone since 1985. (Tr. 68.) When the weather permits, he walks his dog for a mile or two. (Tr. 68.) He grocery shops for the items he needs for himself. (Tr. 69.)
Plaintiff told Dr. Glenn that he has three years of college. (Tr. 200.) He enjoys camping, hunting and fishing, and there has been no change in his interests or habits. (Tr. 200.) Plaintiff said he was restricted by lifting, stooping and bending because of his low back pain and shortness of breath. (Tr. 200.) In regard to his activities of daily living, plaintiff told Dr. Glenn that he likes to read. (Tr. 200.) He washes dishes, cleans the house, grocery shops and gardens. (Tr. 200.) Plaintiff also mows the lawn, rides his bicycle and enjoys listening to country and western music. (Tr. 200.)

Duration, frequency and intensity of pain
Plaintiff testified that he is disabled due to a cracked spine, chest pains, and swelling of the feet. (Tr. 95.) In regard to his back problem, he said that the "Missouri State Police stuck needles in the left side of my body but  and stuck them into my nerves." (Tr. 110.) The foot problem is part of his spinal problem. (Tr. 98.) In regard to his feet, he testified that there is a connection between his feet and his spine. (Tr. 98.) He said in regard to the swelling that, "I've had my toenails removed a couple of times off my big toes because my feet swell up so big that my toenails in my big toe grow out of proportion." (Tr. 99.)
In regard to his physical impairments, plaintiff testified that he believes he is disabled due to a myelogram that a state trooper, who was also a friend of his, performed on him at Missouri Baptist Hospital in Memphis, Tennessee. (Tr. 139, 140.) He said that "A needle was stuck into the nerves on my left side, instead of in my spine, at which I believe damage was done to the nerves." (Tr. 139, 140.) He sees a doctor for this "whenever the people will allow me to." (Tr. *1446 141.) The people, he explained, were mainly the state police. (Tr. 143.) He said the state police denied him treatment at the VA Hospital in Columbia. (Tr. 143.)
Plaintiff testified that he has several precipitating and aggravating factors that complicate his illness. He said, "I believe I had to undergo a lot of emotional strain that normal people wouldn't have to go under  because of the news media mainly." (Tr. 105.) Plaintiff explained that the media follows him because Hollywood and Nashville movie stars often come around where he is. (Tr. 106.) For example, Kenny Rodgers, Crystal Gayle, Loretta Lynn, Barbara Mandrell, Johnny Cash, Tommy Cash and their kids "come around where I'm at and to associate theirself [sic] in the same restaurants or places that I would go to." (Tr. 106, 107.) He further said that some of the stars worked at the VA Hospital. (Tr. 107, 108.) As an example plaintiff said, "this guy that played on  played T.C., he played on Magnum P.I., that colored guy, he was over there taking my blood pressure." (Tr. 108.) When asked if that was unusual, plaintiff explained that perhaps he was doing volunteer work. (Tr. 108.) Plaintiff also testified, "If I heard a story like this, I'd immediately call somebody with a straight-jacket and have him carted off to a psychiatric unit." (Tr. 118.) His attorney asked if he needed a straight-jacket, and he replied, "I hope not."
When asked whether he had an emotional problem, plaintiff testified that he did not know. (Tr. 103.) He testified that he was not under psychiatric care because he was financially unable to do so. (Tr. 103.) He testified that he does not take any psychiatric medication and had never been treated just for a psychiatric problem, although he had attended group meetings. (Tr. 103-104.)
Plaintiff testified that he has arthritis in his legs and back, and gets headaches two or three times a week. (Tr. 61.) He can stand about fifteen minutes, sit for two or three hours, and lift twenty pounds if he lifts using his legs. (Tr. 70, 71.) Plaintiff has difficulty bending and sometimes experiences numbness in his arms. (Tr. 70, 71.) He has to lie down during the day anywhere from two hours to six hours due to back pain. (Tr. 72.) He can sleep well. (Tr. 72.) He also testified he can walk about a mile a day, bend forward and touch his knees, lift ten to twenty pounds, sit a half hour, climb stairs, and drive a car. (Tr. 90, 91.) Plaintiff testified that he was not on any medications. (Tr. 96-97.)
Plaintiff's mother, Ruby, testified that plaintiff had lived with her since 1985. (Tr. 73.) She corroborated plaintiff's testimony, and noted that at times when he comes in after walking or doing yard work, "His legs are wobbly and it affects his speech." (Tr. 74.) She said that plaintiff will "usually just lie down on the floor and sometimes it lasts six, eight hours." (Tr. 75.)

Vocational expert testimony
Dr. Jeffrey Magrowski, a vocational expert, testified at the hearing. (Tr. 148-152.) He testified that, based on plaintiff's testimony and a good mental functional capacity, plaintiff had three and a half years of college in business management and had skills from his jobs in maintenance repair work and plumbing and air conditioning work that would be transferable to semi-skilled sedentary work. (tr. 150.) Those skills involved taking the measurements and abstract skills with interpreting and reading blueprints or drawings, using hand and power tools, he has mechanical skills to diagnose and make repairs to the various types of equipment such as compressor, and also skills in estimating, bidding on jobs and collecting his fees for services. (Tr. 150.)
Dr. Magrowski testified that at the sedentary level, a person with these skills could be a customer service representative, and that there are 700 of them that exist in this region. (Tr. 150, 151.) He also stated there are 2000 order clerk jobs, 5000 production inspector or examiner jobs, 500 procurement clerk jobs and 1000 purchasing agent jobs that a person with aforementioned transferable skills could perform. (Tr. 151.) Assuming a moderate limitation in social functioning, the vocational expert testified that plaintiff could still perform the 5,000 production inspector positions. (Tr. 152.)

*1447 Medical care and treatment

On July 8, 1974, plaintiff was admitted to the VA Hospital in Columbia, Missouri, with somatic complaints. (Tr. 469.) During his hospital stay, he was examined for any organic problems and underwent EEG testing. The test results were normal. (Id.) Plaintiff refused to have a lumbar puncture. (Id.) All physical findings were normal. (Id.) The hospital summary indicated that he suffered hysterical neurosis, conversion type, and depression with occasional suicidal ideations. (Tr. 469.) He was treated with individual psychotherapy and psychodrama therapy, and was discharged on October 2, 1974, with significantly decreased somatic complaints and a mental status within normal limits. (Id.) It was noted upon discharge that he still displayed some mild anxiety and neurotic symptomatology. (Id.)
On March 19, 1975, plaintiff was again admitted to the VA Hospital in Columbia, Missouri, for "transient paraparesis[4] due to undetermined etiology." (Tr. 465.) Plaintiff related that he had been walking with the Dean of Education after class at the university and he felt a hot flash. (Tr. 465.) He was released on March 21, 1975. (Tr. 467.)
On March 26, 1988, plaintiff was seen by Richard A. Comeau, M.D., for a physical examination on behalf of the Missouri Department of Social Services. (Tr. 357-359.) During the medical history, plaintiff told Dr. Comeau that he was hospitalized at the VA Hospital in Columbia in 1975 for two years, in Memphis in 1972, and for one week in 1972 after falling down stairs at a Sikeston hospital. (Tr. at 357.) He also stated that he was allergic to gas and oil, a condition he determined himself after working at a refinery in Salt Lake City from July to December 1987. (Id.) He also stated that, ten years earlier, he had fallen off a truck and it ran over his left hip. (Id.) Dr. Comeau noted that plaintiff's history was "vague as far as details of who treated him  where & when he was treated. We contacted the various places that he mentioned but were unable to get any information or they did not have any record of having treated him." (Tr. 358.) Dr. Comeau noted that x-rays taken February 25, 1988, of the cervical and lumbar spine showed only mild arthritic degenerative change, with no acute process. (Tr. 358.) He noted that plaintiff was overweight but did not show any problem in getting up from a sitting position. (Id.) Overall, Dr. Comeau thought that plaintiff appeared to walk or move without any difficulty, his weight was a problem, and that plaintiff's vague answers on his medical complaints and history "may require psychiatric evaluation." (Tr. 359.)
On April 14, 1988, T.J. Glenn, M.D., a child, adolescent, adult and family psychiatrist, conducted a psychiatric consultative examination of plaintiff at the request of the state. (Tr. 199-204.) Plaintiff told Dr. Glenn that he has had headaches since having a myelogram in 1972 at Baptist Hospital in Memphis, Tennessee. (Tr. 199.) Plaintiff took aspirin for relief of the headache pain. (Tr. 199, 200.) He also stated that he had low back pain since falling down some stairs in 1972, but that he had no difficulty walking short distances, he rode a bicycle one mile a day, but that he could not lift, bend, stoop or push heavy objects. (Id.) He also stated that thirty attempts were made at a lumbar puncture in 1973 while he was in Columbia, Missouri. (Tr. 201.) Plaintiff also told Dr. Glenn that he had been anxious and depressed for the past three or four years as the result of allergies to gasoline and oil, which build up in his body and cause him to be anxious and short-tempered. (Tr. 200, 201.) He relayed that he does not own a car "due to his allergic reactions to gasoline and oil." (Tr. 200.) Dr. Glenn stated that plaintiff had no difficulty coping with pressures or new situations. (Id.)
Dr. Glenn opined that plaintiff had intellectual functioning and attention span in the low average range. (Tr. 202.) He noted that plaintiff gave a history of some nervous tension and depressive symptoms attributed to his allergy reactions. He said plaintiff did not manifest any gross perceptual distortions and reported no history of hallucinations or *1448 illusions. (Tr. 203.) He said plaintiff "did not express any systematized delusions while in the interview." (Id.) He noted plaintiff's energy level was decreased and that he had gained 22 pounds in the past year. (Tr. 201, 203.) It was Dr. Glenn's recommendation that plaintiff receive ongoing medical, neurological and psychiatric evaluations with appropriate treatment as needed for his problems. (Tr. 203.) He reported that plaintiff had no phobic responses and did not meet the criteria for generalized anxiety or depressive disorder. (Tr. 203.) Plaintiff's physical, musculoskeletal, and neurological examinations were unremarkable except for obesity. (Tr. 201-02.)
On January 11, 1989, plaintiff was seen at the VA Hospital in Poplar Bluff, Missouri, for headaches, muscle cramps in both legs and low back pain. (Tr. 307.) He gave a history of arthritis which was worked up by the VA Hospital in Columbia. (Tr. 307.) Upon x-ray of his lumbdsacral spine, there was some narrowing of L4-5 intervertebral space with small marginal spurs pointing to degenerative process of corresponding disc. (Tr. 343, 519, 632.) There was no spine deformity or tenderness found upon physical examination. (Tr. 307.) He was diagnosed with degenerative joint disease in multiple joints and his low back. (Tr. 307.) He was not on medication, but was given Tylenol, Motrin, and Soma. (Tr. 307.) Doctors advised plaintiff to lose weight because this would reduce his back complaints. (Tr. 209.)
On April 7, 1989, Dorothy Munch, D.O., completed a medical report for the Missouri Department of Social Services. (Tr. 327.) Dr. Munch indicated that she had seen plaintiff four times, and that his back was a chronic problem. (Tr. 327.) Upon history, plaintiff revealed significant chest symptomology. (Tr. 327.) Dr. Munch noted no evidence of psychosis, neurosis or mental deficiency. (Tr. 328.) She recommended further diagnostic examination of his heart. (Tr. 328.) Dr. Munch referred him to the Veterans Administration Hospital for a treadmill stress test. (Tr. 326.) Dr. Munch concluded that plaintiff did have a mental and/or physical disability which prevented him from working full time. (Tr. 328.)
On April 24, 1989, plaintiff went to the VA Hospital in Poplar Bluff with chest pains. (Tr. 306.) On April 27, 1989, plaintiff was given a stress test, and the results were negative. (Tr. 305-06, 309.)
On May 9, 1989, plaintiff was seen for a consultative examination by Maynard L. Sisler, M.D., F.A.C.P, a specialist in cardiovascular diseases and internal medicine, on behalf of Stoddard County Division of Family Services. (Tr. 322, 325.) He complained of shortness of breath since 1963. (Tr. 322, 323.) He was measured at 66 1/2 inches and weighed 269 pounds. (Tr. 323.) Dr. Sisler found no stigmata of chronic bronchitis or pulmonary emphysema and he had no typical symptoms of angina. (Tr. 324.) The doctor thought plaintiff's hypertension was suitably controlled with appropriate medication and there was no evidence of end-organ changes. (Tr. 324.) His physical examination was essentially unremarkable. Plaintiff reported that he fell down a flight of stairs in 1972 at the Sikeston hospital and injured his low back and that he had constant back pain since that time. (Tr. 323.) Plaintiff reported his back discomfort was relieved by ibuprofen. (Tr. 323-24.)
On January 29, 1990, W.D. Miller, M.D., examined plaintiff for the Division of Family Services, noted that he was obese and had back problems but concluded that he was not disabled. (Tr. 360-62.) He recommended further diagnostic examination with a bone scan. (Tr. 361.)
On August 13, 1990, William E. Moreland, M.D.,[5] completed a disability report for the Missouri Department of Social Services. (Tr. 457-58.) He stated that plaintiff suffered from morbid obesity, chronic low back pain and there was evidence of neurosis through chronic anxiety. (Tr. 458.) Dr. Moreland felt that plaintiff did have a mental and/or physical disability which prevented him from working full time, and that he expected this disability to last one year. (Tr. 458.)
*1449 On January 22, 1991, plaintiff was examined by William P. Thorpe, M.D., an orthopedic surgeon (Tr. 460), at the request of the county Division of Family Services. (Tr. 459.) He related to Dr. Thorpe that he has had "back pain since he was injured by the State Police approximately two years ago." (Tr. 459.) Plaintiff also told Dr. Thorpe that he had psychiatric treatment and "had needles stuck up and down his back which did not help." (Tr. 459.) Dr. Thorpe noted that plaintiff had no trouble getting on and off the table or getting out of a chair. (Tr. 459.) Dr. Thorpe saw no reason that plaintiff could not perform productive labor with a lifting restriction of 50 pounds and avoiding repetitive bending, lifting or twisting or climbing. (Tr. 459.) His clinical diagnosis was myoligamentus[6] strain, mild. He found no sign of radiculopathy, no sign of disc herniation and no sign of disease that would require surgery or further evaluation. (Tr. 459.)
On February 23, 1992, Dr. Comeau completed another medical report for the Missouri Department of Social Services. (Tr. 455.) He found that plaintiff was not disabled. (Tr. 455-56.) Dr. Comeau noted that plaintiff's weight had increased from 244 pounds to 302 pounds. (Tr. 455.) Dr. Comeau restated that plaintiff had mild degenerative arthritis of the cervical and lumbar spines. (Tr. 456.) Dr. Comeau's diagnosis was that plaintiff needed to lose weight. "Needs to be referred to a psychiatrist. Since he is a veteran possibly they could help him loose [sic] weight." (Tr. 456.)
On March 11, 1992, plaintiff was seen by Chul Kim, M.D., for another consultative examination for the state. (Tr. 442.) He told Dr. Kim that in 1963 while in Vietnam, he jumped with a parachute but landed the wrong way and cracked his entire back and stayed in the hospital for two years. (Tr. 442.) Plaintiff relayed that he completed the 12th grade. (Tr. 442.) At the time of the evaluation, he stood 5' 6" with his shoes off and weighed 291 pounds. (Tr. 443.) Dr. Kim noted that plaintiff was obese and he reported exertional dyspnea, probably from obesity. (Tr. 444.) Upon examination of his joints and extremities, Dr. Kim noted no significant swelling, deformity, heat or limitations of the range of motion in any major joint except for the left ankle which had painful swelling and limited range of motion due to recent sprain. (Tr. 443.) A pulmonary function study was also performed and showed a mild degree of restrictive lung disease which improved to normal following use of a bronchodilator. (Tr. 447-454.) Plaintiff's vision without glasses was 20/70 on the right and 20/20 on the left. (Tr. 443.) Plaintiff reported substernal chest pain not related to exertion, which was probably noncardiac in origin. (Tr. 442, 444.) Plaintiff reported a history of a back injury and reported exertional pain of the lower back running to his left leg. (Tr. 444.) Plaintiff's neurological examination was nonspecific, except for mild tenderness of the lower back on the left side. (Tr. 444.) Range of motion was normal. (Tr. 445-46.)
On April 16, 1992, plaintiff saw Dr. Glenn for another consultative examination at the request of the state. (Tr. 418-441.) Plaintiff reported that he served in Vietnam and had blocked it out of his mind and only remembered it within the past two to three years.[7] (Tr. 418.) He showed symptoms of post traumatic stress disorder, including efforts to avoid thoughts or feelings associated with the trauma, efforts to avoid activities or situations that aroused recollections of the trauma, and irritability. (Tr. 418.) He reported being treated for "nerves" from 1973 to 1974 at the VA Hospital in Columbia, Missouri. (Id.) Plaintiff also reported having anxiety since 1963, related to his alleged cracked spine. He stated that he worried about money and being able to see the right kind of doctors for his spine because the VA Hospitals did not have the right kind of neurologists. (Tr. 418.) Plaintiff denied any trouble keeping a job. (Tr. 419.) Plaintiff denied any problem with depression, but he experienced *1450 overeating, decreased need for sleep, psychomotor retardation, psychomotor agitation, hyperactivity and some flight of ideas. (Tr. 419.)
During the clinical interview, when asked if he gets into trouble with people, plaintiff replied, "Mainly just government employees," stating that he preferred to stay away from them in order to avoid a fight or argument. (Tr. 418-19.) He also reported having thoughts or urges of hurting employees of the VA Hospital and "stars." He stated that government employees from the VA Hospital in Poplar Bluff and country singers always show up everywhere he goes. He reported hearing voices saying "religious stuff" about one year earlier. When asked if he thought people were out to hurt him, he said that he wondered about the purpose of the government employees and the "stars" being around him all the time. (Tr. 419.) He stated that he had been told in 1974 or 1975 by a doctor at the VA Hospital in Columbia, Missouri, that he had schizophrenia. (Id.) Dr. Glenn noted in his report:
His affect reflected anxious facies. His mood reflected a history of anxiety and depression. He gives a chronic history of anxiety and depression and post traumatic stress disorder. He denies having any phobic responses. He denied feeling suicidal or homicidal, and he could test reality in the interview. No perceptual distortions now or in the past. He reports hearing "religious stuff" about one year ago. No other history of hallucinations or illusions, and he expressed no systemized delusions[8] in the interview.
(Tr. 422.) Dr. Glenn's clinical impression concerning plaintiff's mental status was that plaintiff had generalized anxiety with post traumatic stress disorder (PTSD) symptoms from his Vietnam experiences. (Tr. 422.) He recommended ongoing medical, neurological and psychiatric evaluation with appropriate treatment as needed. (Id.)
Dr. Glenn's other clinical impressions were low back and cervical pain syndrome post injury (etiology undetermined), arthritis of multiple joints (etiology undetermined), obesity (etiology undetermined) and a slight impairment of vision (etiology undetermined) (Tr. 422.) Plaintiff denied high blood pressure and chest pain. (Tr. 421.)
In a medical assessment of plaintiff's mental ability to do work-related activities, Dr. Glenn reported that plaintiff's abilities in all categories ranged from unlimited/very good to good. (Tr. 423-24.) On the Wechsler Adult Intelligence Scale-Revised (WAIS-R), plaintiff scored a Full Scale IQ of 83, a Verbal IQ of 85 and Performance IQ of 81. (Tr. 425.) Dr. Glenn noted this would put plaintiff in the "Low Low Average (Old Terminology Dull Average for Verbal and Borderline for Performance and Full Scale) Intellectual Functioning." (Tr. 425.) Nevertheless, in his narrative report, Dr. Glenn wrote that plaintiff's "Intellectual functioning and attention span were average." (Tr. 421.)
Dr. Glenn also administered the Bender Visual Motor Gestalt Test, Adult Version. (Tr. 430.) Plaintiff's Perceptual Adience-Abience Scale (the test attempts to measure the individual's perceptual orientation toward the world (Tr. 434)) score was 36, indicating a better than average prognosis regarding response to psychotherapy. His psychopathology score of 45.75 was similar to test results tending to be associated with moderately severe psychological problems. (Tr. 432.) Diagnostic screening indications were all within normal limits. (Tr. 433.) Analysis of movement and drawing did not indicate any problems. (Tr. 431.) Dr. Glenn's report includes the statement that "[c]aution should be used in applying these interpretive statements to a specific individual." (Tr. 431.)
On the Bender Gestalt Test, Dr. Glenn wrote as follows:
Two factors demonstrated problems related to distortion of the gestalt. Severe retrogression suggests a lag in maturation or a marked failure in psychological defenses due to personality disorganization *1451 or due to intense anxiety. Mild perseveration points to some problems with adaptability and appropriate spontaneity due to an impaired ability to change mental set.... The Psychopathology score is 45.75. Similar test results tend to be associated with moderately severe psychological problems.
(Tr. 431, 432.) Plaintiff's raw score on the Bender Gestalt was 60.[9] (Tr. 436.)
On July 20, 1992, Dr. Jayne E. Niskey, Ph.D., administered the Minnesota Multiphasic Personality Inventory (MMPI)[10] on plaintiff. (Tr. 561-563.) She thought that plaintiff "appears to be experiencing serious psychopathology and may tend to be psychotic or may be exaggerating his problems as a plea for help." (Tr. 561.) She also stated that he exhibited a high score on the L[11] scale, which meant that he was probably not honest in his responses to some of the inventory items. Therefore, she stated that his scores may be lower than would be expected due to this factor. (Tr. 561.) Dr. Niskey believed the resulting profile appeared to be valid. (Tr. 561.) Dr. Niskey interpreted plaintiff's personality characteristics and symptomology based on the MMPI. (Tr. 561, 562.) She found he would have difficulty concentrating and may be anxious. (Tr. 561.) Dr. Niskey's impression was that plaintiff's profile was representative of a person who lacked insight and had very negative feelings about himself. He would tend to be withdrawn from others, and the possibility of substance abuse would need to be explored. If such an individual did not exhibit somatic symptoms, he might complain of tension and depression. (Tr. 562.) She believed that "[p]sychosis may be noted as reflected in his validity and elevated clinical scales." (Tr. 562.)
On February 6, 1995, at the ALJ's request (Tr. 647), Dr. Niskey completed a Mental Residual Functional Capacity Assessment Form. (Tr. 15-18.) After a clinical interview with plaintiff on February 6, 1995, and review of the July 20, 1992, MMPI test interpretation, Dr. Niskey believed that plaintiff had extreme limitation in the areas of ability to cope with stress, function independently, behave in an emotionally stable manner, reliability and ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 15, 16.) Plaintiff would have continual episodes of deterioration in work or work-like settings which would cause him to withdraw from that situation or to experience exacerbation of symptoms. (Tr. 16.) Dr. Niskey also thought there was evidence of paranoid schizophrenia, that plaintiff was psychotic and that others would be endangered if relying on his stability. (Tr. 15, 16.) She stated that he had loose associations and bizarre beliefs with psychotic relaying of false events. (Tr. 15.)
In regard to plaintiff's ability to adjust to a job, Dr. Niskey stated although he would have unlimited/very good ability to relate to co-workers and deal with the public, he would have poor or no ability to use judgment, interact with supervisors, deal with work stresses, function independently, respond to changes in the work setting, and be aware of normal hazards and the appropriate precautions. (Tr. 17.) Scales 6 and 8 were elevated showing plaintiff has schizophrenic type thinking and would "believe persons in authority are trying to hurt him or bring him harm." (Tr. 17.) She also stated that plaintiff had characteristics of a paranoid schizophrenic *1452 and suffered PTSD from Vietnam. (Tr. 18.)
Overall, Dr. Niskey thought that plaintiff presented himself as a very pleasant man. (Tr. 18.) She stated that he appeared to function well on the surface, but as he talked he relayed how Channel 12 news, Dr. Glenn, the highway patrol and country and western singers were trying to harm him. (Tr. 18.) She said that plaintiff "is a nice guy, but he simply is not in touch with reality. You'd never know it to just meet him quickly. After an hour or so of interviewing this is easily discovered. It is clearly supported in the test results of 7/20/92 MMPI." (Tr. 18.)
The record also shows that plaintiff wrote many letters to SSA staff and his attorney, all of which were part of the administrative record and available to the ALJ. (Tr. 332-336, 364-371, 374-380, 384-388, 397-399, 402-403, 406-408, 412-413, 510-511, 525-533, 536-543, 545-559, 604-607, 617-623.) In a letter to ALJ Myron Mills on April 29, 1990, following his April 24, 1990, hearing, plaintiff wrote that the reason he wished he could have had a lawyer with him at a hearing was "I have been in touch with Dr. Jerry Falwell in Lynchburg Virginia about takeing [sic] home college courses." (Tr. 332.) He stated that "these government employees and news media continue to interfer [sic] in my life-Because I am sure it would of been one hell of a life without them." (Tr. 332.) He also wrote, "I will tell you one thing the ReganBush [sic] and CBS would of had one hell of a law suit on their hands if I would of been a lawyer." (Tr. 333.)
Further, plaintiff said, "I believe my case is so unusual that it is to [sic] hot for any lawyer to handel [sic] and may be to [sic] hot for any judges to handel [sic] ... but the whole world is waiting to see just what kind of justice we reall [sic] have.... I have no idea what you will decide. I have no idea what kind of preasure [sic] the news media will put on you and your family." (Tr. 334.) He explains, "But then after all it was the government who disabled me, but you can never get the government to every [sic] admit they made a mistake ... but I am known as the man who brings down wall  just like the Berlin Wall." (Tr. 336.)
On June 22, 1990, ALJ Mills wrote a post-hearing letter to plaintiff relaying that he had additional evidence he proposed to include in the record and gave plaintiff the opportunity to address it or its inclusion. (Tr. 363.) Plaintiff replied, "the only reason that I do not see a Dr. [sic] once a month is that I am unabel [sic] to get a medical card from  the Stoddard County  I do get food stamps and the reason I do not use the VA Hospital any more is because of the State Police.... I also have reason to believe that my son who is dead was also beaten by 2 state police.... I also believe they are the reason my other son is in prision [sic].... For some reason the people who run channel 12 and State Police have taken a dislike to the Stanfield Family, for what reason I do not know." (Tr. 364.) Plaintiff also wrote, "I have seen 4 presidents and I have never been to Washington or a political Rally.... It is not just every day you can make 2 presidents mad at you. It is not every day you can just show your ass all over the country." (Tr. 367, 370.)
After plaintiff received an unfavorable hearing decision from ALJ Mills, he wrote "I do not agree with his decision.... I think that is a shame that a god fearin [sic] Christian who goes to church and gives the Lord 10% for the Lords Word has to put up with a bunch of drunk and dope heads from Nashiville [sic] Tenn. Not only in the county office but your Poplar Bluff office and the V.A. Hospital." (Tr. 384.) In yet another letter to ALJ Mills, plaintiff wrote, "Something is sure not Right [sic] in this country When [sic] a god fearin [sic] Christian can serve his country and then have so much troubel [sic] out of the news media both CBS and Channell [sic] 12." (Tr. 387.)
Plaintiff wrote another letter, undated, explaining "You [sic] can not fight people [sic] in the news media who are on Dope [sic]. They pulled their own Hiders [sic] experiment with me and my family. You can not fight crazy people." (Tr. 402.) On March 3, 1992, plaintiff wrote on a Reconsideration Disability Report "I was used for an experiment by the SS Adminstration [sic]  the State Police  Channell [sic] 12 voc [sic] rehab ... the emonital [sic] strain on me and *1453 my family has been almost fatal." (Tr. 486.) To his attorney, Janet K. Brown, plaintiff wrote, "I would of made one hell of a lawyer. At least if I would of had the chance I believed I could of dazzled the Judge with my knowledge of the law. I at least would of put these government employees where they belong in the Sewer." (Tr. 530.) In July 1992, plaintiff wrote his belief that "in this case the Republican party is on trial." (Tr. 545.) In another letter to Mrs. Brown written late in 1994, plaintiff said "up until about 4 week ago I was constandely [sic] being called by movie stars from Nashville and there [sic] kids telling me that I would not receive my disability." (Tr. 621.)

The ALJ's Determination
The ALJ made the following findings:
(1) plaintiff met the disability insured status requirements of the Social Security Act on April 1, 1985, and on February 1, 1983, the dates the plaintiff stated he became unable to work, and continued to meet them through September 30, 1986;
(2) the plaintiff has not engaged in substantial gainful activity since 1985;
(3) the medical evidence establishes that plaintiff has mild arthritis of the spine, degenerative joint disease, lumbosacral sprain, mild varicose veins in the left leg, anxiety, chronic sinusitis, and obesity, but that he did not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1, Subpart P, Regulations No. 4;
(4) plaintiff's allegations of symptoms precluding sedentary work were not credible based on inconsistencies in the record as a whole;
(5) plaintiff cannot lift more than ten pounds and has a less than moderate limitation for social functioning;
(6) plaintiff is unable to perform his past relevant work as maintenance/repairman;
(7) plaintiff has the residual functional capacity to perform the full range of sedentary work;
(8) plaintiff is 53 years old, which is defined as closely approaching advanced age;
(9) plaintiff completed a high school education and three and one-half years of college;
(10) plaintiff has acquired work skills, such as those gained in owning a profitable business, and college course work in business management. Other skills acquired were measuring, operating hand and power tools, interpreting/reading blueprints and drawings, diagnosing and repairing equipment, estimating job costs, bidding on jobs, and collecting his fees, all of which he demonstrated in past work. Considering his residual functional capacity, these skills can be applied to meet the requirements of semi-skilled work activities of other work which exist in significant numbers in the national economy. Examples of such jobs are customer service representative, order clerk, production inspector/examiner, procurement clerk, and purchasing agent. Those jobs can all be performed with a less than moderate limitation for social functioning, and the production inspector positions can even be performed with a moderate limitation of social functioning.
(11) based on plaintiff's residual function capacity, age, education and work experience, plaintiff is not disabled; and
(12) plaintiff was not under a disability at any time through the date of the decision.
(Tr. 35-36.)

Evidence Submitted After the ALJ's Determination
On April 3, 1995, after the ALJ's decision, James T. Hurley, Ed.D., a licensed psychologist, examined plaintiff at the request of plaintiff's attorney and performed a psychological evaluation. (Tr. 655-659.) Dr. Hurley reviewed plaintiff's medical records, performed a clinical interview and administered the Beck Depression Scale, Diagnostic Inventory of Personality and Symptoms, and the Rorschach Projective Technique. (Tr. 655-659.) In reference to his review of the medical records, Dr. Hurley wrote as follows:
In reviewing the previous testing done by Dr. Glenn and Dr. Niskey there are several points that should be made. Dr. Glenn had reported that the patient indicated *1454 that he had been in Viet Nam and blocked it out of his mind but that his memory had almost returned completely within the past 2 or 3 years. He states that he exhibits symptoms of Post Traumatic Stress Disorder. In addition Dr. Glenn notes that the patient had described to him the delusions about the government employees. He reports that the patient expresses symptoms of overeating, decreased need for sleep, psychomotor retardation and psychomotor agitation along with some flight of ideas. In addition the patient reported anxiety attacks and problems with concentration. He reports that the patient's mood reflected a history of anxiety and depression. He gave the patient a WAIS-R cognitive assessment with a resulting Verbal IQ of 85, Performance IQ of 81 and Full Scale IQ of 83. This would place him in the Low Average Range of intelligence but this would not be consistent with an individual completing 3 years of college. He also gave the patient a Bender Gestalt which yielded a psychopathology score of 45.75 which suggests moderate psychological problems. Yet his ratings are not consistent with the findings in the report. He rates him as "good" in behaving in an emotionally stable manner and relating predictably in social situations, yet with his delusional system this would not be consistent.
Dr. Niskey had given the patient an MMPI with psychosis a strong possibility as reflected in the validity and elevated clinical scales. She indicates that the patient expresses psychotic thinking and that he is out of touch with reality. She felt that stress may trigger the psychosis. She rated him as having extreme limitations in his ability to cope with stress, his ability to function independently and to behave in an emotionally stable manner.
(Tr. 656-657.)
On the Diagnostic Inventory of Personality and Symptoms, administered by Dr. Hurley, plaintiff scored "extremely high in Schizophrenic Psychosis, Paranoid Psychosis and Affective Depressed Disorders." (Tr. 657.)
During the clinical interview, plaintiff gave a personal background of having last worked in 1985, and most of his work was plumbing and heating and air conditioning. (Tr. 655.) He told Dr. Hurley he did not complete college because his GI bill ran out, after which he decided to stay at the VA Hospital in Columbia for a year and a half. (Tr. 655.) Dr. Hurley notes that "At this point in the interview his delusional system becomes more apparent." (Tr. 655.) Plaintiff told Dr. Hurley that "ever since I was in the 4th grade I have had to put up with the state police and federal employees wanting to know about me." (Tr. 655-656.) He stated that Dolly Parton worked in a restaurant in his town and that he had been out with her and that he had also dated Dotty West. He also stated that the television station in Cape Girardeau passed on information about him to the movie business in California. (Tr. 656.)
Dr. Hurley stated that plaintiff exhibited loose associations, had delusions of persecution, had an "elaborate delusional system of how government employees through the media, government agents and country western singers have spent vast amounts of money to keep track of him and how they have ruined his life. His long term memory is confused by this delusional system." (Tr. 656.)
Dr. Hurley concluded that plaintiff had schizophrenia, paranoid type and that he believed that plaintiff had been disabled since the 1970s and early 1980s. (Tr. 658.) He concluded as follows:
It is felt that this patient presents a rather severe level of psychopathology which has been underrated or overlooked by other reports. As indicated in this report, a previous psychiatric report gives indications of this patient's symptoms but the diagnosis is not consistent with the symptoms. The patient exhibits a central theme delusion which is consistent with paranoid schizophrenics. There is a long history of this disorder being present.
At present this patient is not able to function psychologically. Aside from the physical condition, he exhibits an impaired ability to function occupationally, both with supervisors and co-workers. He has an impaired ability to function socially. His attention and concentration are impaired *1455 by the paranoid delusions. His ability to behave in an emotionally stable manner is impaired.
(Tr. 658.)

The Appeals Council decision
On request for review of the ALJ's decision, the Appeals Council noted that plaintiff's attorney had submitted a new February 1995 assessment from Dr. Niskey. (Tr. 7.) The Appeals Council stated that Dr. Niskey had not seen plaintiff since her July 1992 evaluation. In the absence of any new contact from Dr. Niskey with plaintiff, the Appeals Council stated that her new assessment carried no more evidentiary weight than her prior report. (Tr. 7.) However, Dr. Niskey did see plaintiff in 1995, as noted in her report, and she stated that her assessment was based on an interview conducted on February 1, 1995, and the July 20, 1990, MMPI results. (Tr. 648.) Nevertheless, the Appeals Council denial of review is unreviewable by this court. 20 C.F.R. § 416.1470(b).
The Appeals Council also stated that Dr. Hurley's report was inconsistent with the other medical reports in the record as a whole and therefore was not persuasive. (Tr. 7.) Specifically, the Appeals Council noted that Dr. Hurley reported symptoms of psychosis so extreme that they could not reasonably be expected to have escaped the notice of any medical professional, yet none of the physicians who most recently examined and reported on plaintiff's condition from 1990 to 1992 (including Drs. Thorpe, Morehead, Comeau and Kim) made note of symptoms remotely similar to what Dr. Hurley had reported. (Tr. 7.)[12]

DISCUSSION
The Commissioner's decision is conclusive upon this court if it is supported by relevant evidence a reasonable person might accept as adequate to support the decision, i.e., "substantial evidence." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). To be disabled under the Act, plaintiff must show that he is unable to engage in any substantial gainful activity by reason of a medically determinable impairment which can be expected to end in death or which has lasted or can be expected to last for not less than twelve months. 42 U.S.C. § 1383(c)(3); Russell v. Secretary of HEW, 402 F.Supp. 613, 618 (E.D.Mo.1975), aff'd, 540 F.2d 353 (8th Cir. 1976). If plaintiff retains the ability to perform his former work, he is not disabled. See Pickner v. Sullivan, 985 F.2d 401, 402-03 (8th Cir.1993).
In reviewing the record for substantial evidence, the court may not make its own findings of fact by reweighing the evidence and substituting its own judgment for that of the Commissioner. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir.1987).
The determination of substantial evidence vel non "is more than a search for the existence of substantial evidence supporting the Commissioner's decision," as "`the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" Piercy v. Bowen, 835 F.2d 190, 191 (8th Cir.1987) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)). See also Clarke v. Bowen, 843 F.2d 271, 272 (8th Cir.1988). A reviewing court should affirm a decision that is supported by substantial evidence. Baker v. Secretary of Health and Human Services, 955 F.2d 552, 554 (8th Cir. 1992).
Plaintiff argues that the previous applications he filed for Title II and Title XVI benefits on January 5, 1987, and January 20, 1988, were reopened by the ALJ.
Plaintiff previously established a period of disability from July 1974 through January 1983. (Tr. 33, 266, 501.) Thereafter, in 1984 and 1985, plaintiff performed substantial gainful activity. (Tr. 502.) See 20 C.F.R. §§ 404.1574(b)(2)(vi) and 416.974(b)(2)(vi) (earnings averaging more than $300 a month).
The parties agree that September 30, 1986, is the date that plaintiff was last insured for purposes of a period of disability *1456 and disability insurance benefits under Title II. Therefore, the issue is whether he was disabled within the meaning of the Act prior to that date. Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir.1984); Dunlap v. Harris, 649 F.2d 637, 638 (8th Cir.1981). A nondisabling condition which later develops into a disabling condition after the expiration of a claimant's insured status cannot be the basis for an award of disability benefits under Title II. Thomas v. Sullivan, 928 F.2d 255, 260-61 (8th Cir.1991); Dunlap, 649 F.2d at 638. It is not enough that the impairments existed before the date plaintiff's insured status expired; those impairments must have been disabling at that time. See Lopez v. Bowen, 806 F.2d 632, 633 (5th Cir.1986).
Unlike disability benefits, SSI benefits do not require any disability insured status. Parsons v. Heckler, 739 F.2d 1334, 1336 n. 2 (8th Cir.1984).
Plaintiff's current or any reopened applications are effective for a limited period of time. In addition to showing that he was disabled prior to the expiration of his insured status, he must show that he has been continuously disabled since that time, or that his disability did not end prior to the twelve-month period before the month he filed the relevant application. An application is retroactive for no more than 17 months, the required five-month waiting period and twelve months of retroactivity. A claimant's waiting period can begin no earlier than the 17th month prior to the month he applied, regardless of how long he has been disabled. 20 C.F.R. §§ 404.315, 404.316, and 404.320. No waiting period is required if a claimant previously was entitled to disability benefits or a period of disability within five years of the month he again becomes disabled. 20 C.F.R. § 404.315(a)(4).
After the April 24, 1990, hearing, the ALJ issued an unfavorable decision dated July 24, 1990, based on the medical and other evidence of record. (Tr. 389-396.) He wrote that plaintiff had not engaged in substantial gainful activity since 1985. (Tr. 393.) In that decision, the ALJ addressed only the applications filed on July 17, 1989. (Tr. 394) The ALJ stated that he found no reason to reopen any of the previous applications. (Tr. 393.)
After the July 14, 1992, hearing, the ALJ issued an unfavorable decision on January 27, 1994, based on the medical and other evidence of record. (Tr. 586-602.) The ALJ found that plaintiff had not engaged in substantial gainful activity since 1985. (Tr. 595.) He noted that plaintiff "requested that the previous applications be reopened, so the claimant's file was recalled."[13] (Tr. 586.) The ALJ stated that his decision was based on the applications filed July 17, 1989, and on February 4, 1992. (Tr. 595-96.)
In the subsequent remand on July 22, 1994, the Appeals Council vacated that part of the decision that related to plaintiff's SSI (Title XVI) application. (Tr. 579.) Inconsistently, however, the Appeals Council requested additional development of the record concerning plaintiff's condition and capabilities prior to the date he was last insured for Title II benefits. (Tr. 580-81.)
After a supplemental hearing was held before an ALJ on January 12, 1995, the ALJ issued an unfavorable hearing decision dated March 11, 1995. (Tr. 23-40.) The ALJ, in that decision, noted that plaintiff previously requested reopening. (Tr. 25.) The ALJ stated that his decision was based on the applications filed July 17, 1989, and on February 4, 1992. (Tr. 36.) He also found that plaintiff met the disability insured status requirements on April 1, 1985, and on February 1, 1983, the dates plaintiff stated he became unable to work, and continued to meet them through September 30, 1986. (Tr. 35.) In his findings, the ALJ wrote that plaintiff had not engaged in substantial gainful activity since 1985. (Tr. 26.)
A claim can be treated as having been reopened as a matter of administrative discretion where the Commissioner reconsiders the merits of the application previously denied. Underwood v. Bowen, 807 F.2d 141, 143 (8th Cir.1986); Jelinek v. Heckler, 764 F.2d 507, 508 (8th Cir.1985). "Consequently, the final decision of the [Commissioner] denying such a claim is also subject to judicial *1457 review to the extent it has been reopened." Jelinek, 764 F.2d at 508-09 (citations omitted). The mere consideration of evidence from earlier applications, without more, is not a reopening of the earlier claims. King v. Chater, 90 F.3d 323, 325 (8th Cir.1996); Burks-Marshall v. Shalala, 7 F.3d 1346, 1348 (8th Cir.1993); Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cir.1989). The Commissioner's factual review of a prior administrative decision, which plaintiff did not appeal, is not a consideration of the merits of the prior decision so as to constitute a reopening. Robertson v. Sullivan, 979 F.2d 623, 625 (8th Cir.1992).
A claim can be reopened for any reason within one year of the date of the notice of initial determination, or for good cause within four years in a Title II case and within two years in a Title XVI case. 20 C.F.R. §§ 404.988, 404.989, 416.1488 and 416.1489.[14] Whether an ALJ considered an earlier claim or not, reopening the case more than four years after the initial denial of the Title II claim and more than two years after the initial denial of the Title XVI claim would exceed the authority of the ALJ. See King, 90 F.3d at 325.
Clearly, the ALJ in his decision of July 24, 1990, did not reopen plaintiff's earlier applications. But the January 27, 1994, and March 11, 1995, decisions specifically stated that the decisions were based on the applications filed July 17, 1989, and on February 4, 1992. (Tr. 36.) Therefore, even though the record shows that plaintiff's February 4, 1992, application for Title II benefits was initially denied on the grounds of res judicata (Tr. 512), the ALJ ruled on the merits of the claims in that application.
An application for Title XVI benefits is effective with the month it is filed, assuming all other requirements are met. 20 C.F.R. § 416.335. Consequently, if only the July 17, 1989, SSI application was reopened, the relevant period for the court's consideration of plaintiff's claims for Title XVI benefits would begin July 1989.
There is no evidence in the record that the applications filed before July 17, 1989, were reopened. Therefore, the question of whether plaintiff was disabled prior to the date of the previous unfavorable decisions on February 24, 1987, April 28, 1988, and April 3, 1989, is res judicata because those dates were after the date that his insured status for Title II benefits expired.
The cardinal issue presented by this action is whether the final decision of the Commissioner is supported by substantial evidence in the record as a whole.
Plaintiff argues that the ALJ's decision denying plaintiff's applications is not based on substantial evidence on the record as a whole because the ALJ (1) attached too much weight to the opinion of Dr. Glenn while improperly discrediting the opinion of Dr. Niskey; (2) failed to fully and fairly develop the administrative record; (3) failed to ask the vocational expert a proper hypothetical question; and (4) failed to apply the proper standard for evaluating subjective complaints of pain and other symptoms. He seeks a complete reversal of the hearing decision.
First, plaintiff argues that the ALJ gave too much weight to Dr. Glenn's medical opinion and improperly discredited Dr. Niskey's medical opinion. Plaintiff's primary argument appears to be that he is unable to work because of mental problems, as demonstrated by his letters and his testimony.
Defendant argues that the ALJ's decision is supported by substantial evidence and that plaintiff's activities are not those of an individual incapacitated by physical and/or mental impairments.
Plaintiff's medical history concerning his mental condition is sparse. The record shows that he was diagnosed with hysterical neurosis, conversion type, and depression with occasional suicidal tendencies during a three-month hospitalization in 1974 at a VA Hospital. He was treated with therapy and it was noted upon discharge that his somatic symptoms had decreased and his mental status was normal. There is nothing further in the records concerning his mental status until *1458 14 years later in 1988 when Dr. Glenn evaluated him for the Social Security Administration and recommended ongoing psychological treatment. There is nothing in the record indicating that plaintiff sought such treatment. In April 1989, Dr. Munch, who had seen the plaintiff four times, found no evidence of psychosis, neurosis or mental deficiency. In August 1990, Dr. Moreland, who was evaluating plaintiff for a disability report, noted evidence of neurosis through chronic anxiety. In April 1992, when Dr. Glenn again examined plaintiff for a consultation, plaintiff was noted' to be experiencing overeating, decreased sleep, psychomotor retardation, psychomotor agitation, hyperactivity and flight of ideas. Plaintiff also said he wanted to "hurt" VA employees and stars. Dr. Glenn diagnosed generalized anxiety with post-traumatic stress disorder and recommended ongoing treatment. Dr. Glenn had noted that the test results showed that plaintiff had moderately severe psychological problems but Dr. Glenn did not discuss this in his report. There is nothing in the record indicating that plaintiff sought treatment.
The Commissioner has implemented regulations that specifically address mental impairments and require a special procedure to be followed at each level of administrative review. Pratt v. Sullivan, 956 F.2d 830, 834 (8th Cir.1992) (citing 20 C.F.R. §§ 404.1520(a), 404.1520a(a)). The regulations require that the steps of the procedure be documented at each level by completion of a standard document titled "Psychiatric Technique Review Form" (PRTF), which is essentially a checklist that tracks the requirements of the Listings of Mental Disorders. Id. See 20 C.F.R. § 404.1520a(d).
At the initial and reconsideration levels, the PRTF must be completed and signed by a medical consultant. Montgomery v. Shalala, 30 F.3d 98, 99 (8th Cir.1994) (citing 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1)). At the hearing level, the ALJ may complete the PRTF with or without the assistance of a medical advisor. Id. The PRTF must be attached to the ALJ's decision. Pratt, 956 F.2d at 834. In this case, the ALJ completed the PRTF and attached it to his decision. (Tr. 38-40.)
The evaluation of a mental impairment also follows a sequential process, delineated in 20 C.F.R. § 404.1520a. Id. The first step is to record pertinent signs, symptoms, and findings to determine if a mental impairment exists. Id. (citing 20 C.F.R. §§ 404.1520a, 1520a(b)(1)). These are gleaned from a mental status examination or psychiatric history and must be established by medical evidence consisting of signs, symptoms and laboratory findings. Pratt, 956 F.2d at 835.
If a mental impairment is found, the ALJ must then analyze whether certain medical findings relevant to ability to work are present or absent. Id. (citing 20 C.F.R. § 404.1520a(b)(3)). This analysis requires the ALJ to rate the degree of functional loss resulting from the impairment in four areas of function which are deemed essential to work: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings. Id. The first two categories are rated on a five-point scale: none, slight, moderate, marked, and extreme. The third category is rated: never, seldom, often, frequent, and constant. The fourth category is rated: never, once or twice, repeated, or continual. Id. at 835 n. 10. Ratings of "none or slight" in the first and second areas, "never or seldom" in the third area, and "never" in the fourth area generally indicate that an impairment is not severe unless evidence indicates otherwise. Id. (citing 20 C.F.R. § 404.1520a(c)(1)). If the claimant has a severe impairment, but the impairment neither meets or equals the listing, then the ALJ is to do a residual functional capacity assessment. Id.
The mere existence of a mental condition is not per se disabling. See, e.g., Dunlap v. Harris, 649 F.2d 637, 638 (8th Cir. 1981). Where a claimant's mental or emotional problems do not result in a marked restriction of his daily activities, constriction of interests, deterioration of personal habits or impaired ability to relate, they are not disabling. See Gavin v. Heckler, 811 F.2d 1195, 1198 (8th Cir.1987). See also 20 C.F.R. §§ 404.1520a and 416.920a.
The Commissioner has promulgated a list of specified impairments that qualify as per *1459 se disabilities for purposes of the Social Security Act. See 20 C.F.R. § 404, Subpt P, App. 1. Under the third step of the Commissioner's evaluation process, a claimant seeking disability benefits is entitled to a finding of disability if he possesses an impairment that meets one of these listed impairments. Id. § 404.1520(d). Here, the ALJ completed the Psychiatric Review Technique Form, evaluating plaintiff under § 12.06, which covers anxiety related disorders. The ALJ determined that plaintiff satisfied the first part (Part A) of the listing because he was suffering from post traumatic stress disorder and generalized anxiety. (Tr. 38-39.) However, the ALJ found that plaintiff did not satisfy the second part (Part B) because he did not suffer from at least two of the four restrictions listed. (Tr. 39-40.) The ALJ also concluded that plaintiff did not satisfy the third part (Part C) of the listing. (Tr. 40.) The required level of severity is met for these disorders only when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied. 20 C.F.R. § 404, Subpt. P, App. 1, § 12.06.
In his decision, the ALJ noted that there was evidence of generalized anxiety with post traumatic stress disorder symptoms and depression. However, the ALJ noted, the plaintiff had not required hospitalization and it had not impaired his social functioning, daily activities, concentration, persistence, pace or caused a deterioration or decompensation in work or work-like settings. Therefore, the ALJ found it was not a severe impairment and did not impair his mental ability to function. The ALJ found there was no persuasive evidence of the existence of psychopathic or psychotic personality traits. (Tr. 32.)
The ALJ's conclusion in 1995 concerning plaintiff's mental condition was based on the consultative examination performed by Dr. Glenn in 1992. (Tr. 32-35.) The ALJ found that the opinion of Dr. Glenn, a board certified psychiatrist and licensed psychologist, was entitled to more weight than the opinion of Dr. Niskey, Ph.D., a marriage, family and child counselor. (Tr. 29.) Dr. Glenn's clinical impression was that plaintiff suffered generalized anxiety with post traumatic stress disorder symptoms from Vietnam. (Tr. 422.) The ALJ wrote that the remainder of Dr. Glenn's comments indicated that plaintiff "had a very good ability to engage in work and to behave reliably with no anomalies found." (Tr. 32.) The ALJ concluded that "based on Dr. Glenn's evaluation ... it is found that [plaintiff] has a less than moderate limitation in social functioning ... [and] is not disabled because he can perform work existing in significant numbers in the national economy." (Tr. 35.)
The weight accorded to a doctor's opinion generally depends on the extent to which it is supported by clinical findings. See Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); 20 C.F.R. § 404.1527(d)(2). Dr. Glenn's report is unsupported by his own clinical findings and contains inconsistencies. For example, Dr. Glenn noted in his report that plaintiff had described thoughts or urges he had of wanting to hurt VA Hospital employees and "stars" and how these people showed up everywhere he went. (Tr. 419.) Yet, when discussing plaintiff's mental status, Dr. Glenn stated that other than hearing voices about "religious stuff" one year earlier, plaintiff had no other history of hallucinations or illusions and expressed no systemized delusions in the interview. (Tr. 422.) Dr. Glenn did not address the comments plaintiff made during the consultation concerning his desire to "hurt" people. Furthermore, there are a number of documents in the record that show plaintiff making similar comments. He also made these comments at the hearing. The ALJ addressed these statements made by plaintiff in his testimony and letters by saying that plaintiff's remarks in reference to delusion about state employees' involvement in his life did not rise to the level of significant impairment. (Tr. 35.) The ALJ stated that there was no medical evidence that this behavior had any impact on any aspect of plaintiff's activities and that he had not received any psychiatric treatment. (Tr. 32, 35.)
Other than plaintiff's hospitalization and treatment in 1974 for neurosis and depression, the evidence shows that plaintiff had not recently sought treatment for a mental impairment, nor did he allege disability due *1460 to any mental impairment in his application for disability benefits. See Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir.1993). Nor is there any evidence that he took any medication for any mental condition. However, this does not prove that a disabling condition does not exist. A person suffering from a mental condition may not recognize the need for treatment. See Tucker v. Sullivan, 779 F.Supp. 1290, 1297 (D.Kan.1991). Plaintiff testified at the hearing that he did not know whether he had a mental problem. (Tr. 103.)
In addition, Dr. Glenn's report on the results of plaintiff's Bender Gestalt test stated that plaintiff's psychopathology score tended to be associated with moderately severe psychological problems. (Tr. 432.)[15] Dr. Glenn stated that the test findings reflected plaintiff's impaired intellectual functioning, but that plaintiff understood what was asked of him in the test information and that he proceeded in a responsible, capable manner in keeping with his intelligence level and potential. (Tr. 430.)
The ALJ also improperly discredited the medical opinion of Dr. Niskey. The ALJ determined that Dr. Niskey's findings were not credible because on the MMPI she administered, she found it was a valid profile in spite of the fact that plaintiff had a particularly high score in one of the scales indicating he probably was not honest in his responses to some of the inventory items. (Tr. 29.) An ALJ may not substitute his opinion for that of a qualified psychologist or psychiatrist. Bilby v. Schweiker, 762 F.2d 716, 719 (9th Cir.1985); Grimmett v. Heckler, 607 F.Supp. 502, 503 (S.D.W.Va.1985).
The ALJ also found that Dr. Niskey's report contained inconsistencies because she stated that plaintiff may be psychopathic or psychotic, but that he could also be exaggerating. (Tr. 29.) Dr. Niskey stated in her report that plaintiff "appears to be experiencing serious psychopathology and may tend to be psychotic or may be exaggerating his problems as a plea for help." (Tr. 561.) The court does not find these statements to be inconsistent.
The ALJ also criticized the fact that Dr. Niskey had said the results of the MMPI she administered were "representative of a person" and not specific to plaintiff. (Tr. 29.) However, saying that a result was "representative of a person" is not error. See Brown v. Bowen, 682 F.Supp. 858, 861 (W.D.Va. 1988) (psychologist interpreting MMPI observed that "[i]ndividuals with this type of profile....").
The ALJ did not consider Dr. Niskey's RFC, even though the ALJ requested that she complete one. (Tr. 25-37, 647.) Plaintiff's attorney sent the report to the ALJ on February 9, 1995 (Tr. 646), it was received on February 13, 1995 (Tr. 15), and the hearing decision was issued on March 11, 1995 (Tr. 23).
The Appeals Council considered the reports of Dr. Niskey and Dr. Hurley but denied review. This court cannot review the propriety of the Appeals Council's decision to deny review; the court's role is limited to deciding whether the ALJ's determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made. See, e.g., Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir.1992); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir.1992). That means that the court must speculate to some extent on how the ALJ would have weighed the newly submitted reports if they had been available for the original hearing. Riley v. Shalala, 18 F.3d 619, 622 (8th Cir.1994).
To be eligible for benefits under Title II, plaintiff must establish that he was disabled prior to the expiration of his insured status on September 30, 1986. See 42 U.S.C. §§ 416(i) and 423(c). To be eligible for Title XVI benefits, plaintiff must have been disabled while his application was pending. 42 *1461 U.S.C. § 1382(c); 20 C.F.R. §§ 416.330 and 416.335.
There is substantial evidence on the record as a whole to support the ALJ's decision that, prior to September 30, 1986, plaintiff did not suffer from a mental disorder that affected his ability to work. See Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir.1994). While plaintiff had been diagnosed with various disorders, only Dr. Hurley indicated that plaintiff suffered a significant mental disorder prior to September 30, 1986. He suggested that plaintiff's mental status had become worse following his military service. However, plaintiff performed substantial gainful activity in 1984 and 1985. There is no evidence in the record that plaintiff's work in 1984 and 1985 was affected by any mental condition.
However, with respect to plaintiff's application for Title XVI benefits, the undersigned concludes that there is not substantial evidence on the record as a whole to support the Secretary. Where the total record is overwhelmingly in support of a finding of disability and plaintiff has demonstrated his disability by medical evidence on the record as a whole, there is no need to remand. Gavin v. Heckler, 811 F.2d 1195, 1201 (8th Cir.1987). The record is clear that plaintiff had a mental disorder that is long-standing. Psychological disorders usually do not occur overnight. Culbertson, 30 F.3d at 939 n. 4. Dr. Glenn noted in his report of April 16, 1992, that plaintiff's post traumatic stress disorder symptoms had started within the past three to four years (1988) as he had regained his memory of Vietnam. (Tr. 418.) The Eighth Circuit has observed, "PTSD is an unstable condition that may not manifest itself until well after the stressful event which caused it, and may wax and wane after manifestation." Jones v. Chater, 65 F.3d 102, 103 (8th Cir.1995). Both Drs. Niskey and Hurley stated that plaintiff was unable to work.
Dr. Niskey found that plaintiff had extreme limitation in the areas of ability to cope with stress, function independently, behave in an emotionally stable manner, reliability and ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 15, 16.) Plaintiff would have continual episodes of deterioration in work or work-like settings which would cause him to withdraw from that situation or to experience exacerbation of symptoms. (Tr. 16.) As to his ability to adjust to a job, Dr. Niskey stated that plaintiff would have unlimited/very good ability to relate to co-workers and deal with the public, but that he would have poor or no ability to use judgment, interact with supervisors, deal with work stresses, function independently, respond to changes in the work setting, and be aware of normal hazards and the appropriate precautions. (Tr. 17.) Dr. Niskey also stated that other people would be endangered if they relied on his stability. (Tr. 15.)
Dr. Hurley also found that plaintiff had an impaired ability to function occupationally. (Tr. 658.)
These doctors' conclusions are consistent with findings in Dr. Glenn's report. Although Dr. Glenn noted in his report that plaintiff had described thoughts or urges he had of wanting to hurt VA Hospital employees and "stars" and how these people showed up everywhere he went (Tr. 419), Dr. Glenn stated, inconsistently, that plaintiff expressed no systemized delusions in the interview and his thought processes reflected rational thinking. (Tr. 421-422.) Dr. Glenn did not address the comments plaintiff made during the consultation concerning his desire to "hurt" people.
Therefore, the court believes that the record in this case has been fully developed and that the Secretary's decision with regard to plaintiff's Title XVI benefits should be reversed and the Commissioner ordered to pay plaintiff benefits in the appropriate amount.
Next, the plaintiff argues that the ALJ did not properly evaluate plaintiff's subjective complaints of pain. The proper standard for evaluation of pain is found in Polaski v. Heckler, 739 F.2d 1320 (8th Cir.1984). The ALJ must evaluate subjective complaints of pain giving full consideration to all of the evidence presented relating to the complaints, *1462 including the plaintiff's work record, observations by third parties and treating and examining physicians relating to such matters as: (1) plaintiff's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medications; and (5) functional restrictions. Id. at 1322.
The objective evidence of record does not support plaintiff's complaints of physical pain.
Plaintiff alleges that he is disabled because of back problems and chest pain. An individual's complaints alone are not conclusive evidence of disability and the Commissioner is not bound by plaintiff's testimony. Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir.1988). Subjective complaints are recognized as disabling when they are not remediable and preclude plaintiff from engaging in any form of substantial gainful activity. Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir.1989); Benson v. Matthews, 554 F.2d 860, 863 (8th Cir.1977). The mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. Cruse, 867 F.2d at 1186; Edwards v. Secretary of HHS, 809 F.2d 506, 508 (8th Cir.1987). It is for the Commissioner to weigh the evidence and assess plaintiff's credibility. If there are inconsistencies in the evidence as a whole, the Commissioner may disbelieve subjective testimony. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir.1995); Roth v. Shalala, 45 F.3d 279, 283 (8th Cir.1995).
The objective medical evidence does not support plaintiff's claim that his physical impairments were disabling on or before September 30, 1986, or through the date of the ALJ's decision. The absence of an objective medical basis to support the degree of severity of subjective complaints alleged is a factor to be considered in evaluating the credibility of the testimony and the complaints. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984).
The ALJ found that plaintiff had mild arthritis of the spine, degenerative joint disease; and lumbosacral sprain. (Tr. 35.) However, the record as a whole did not indicate that plaintiff's back condition, alone or in combination with other physical impairments, prevented him from engaging in all substantial gainful activity during the relevant periods. See e.g., Clark v. Shalala, 28 F.3d 828, 831 (8th Cir.1994) (claimant with back pain, an ulcer, high blood pressure, and diabetes was not disabled); Woolf v. Shalala, 3 F.3d 1210 (8th Cir.1993) (claimant who alleged back problems from multiple automobile accidents, a work-related accident, and a fall was not disabled); Locher v. Sullivan, 968 F.2d 725 (8th Cir.1992) (claimant who complained of back pain following injury and surgery was not disabled).
The ALJ also found that plaintiff had mild varicose veins in his left leg, chronic sinusitis, anxiety, and obesity. (Tr. 35.) Plaintiff performed substantial gainful activity for an extended period in 1984 and 1985. Thereafter, he does not show that his physical condition deteriorated. Plaintiff sought no treatment for any impairment during 1986 or 1987, and he sought minimal treatment thereafter.
Plaintiff sought no treatment prior to the expiration of his insured status, and his contacts with physicians during the relevant period for Title XVI benefits were primarily for consultative examinations in connection with his Social Security applications or with his effort to obtain county welfare benefits. (Tr. 404.) Although plaintiff states he could not afford treatment, treatment was available at the Poplar Bluff VAMC at all relevant times. (Tr. 624-25.) On May 13, 1994, the Regional Director, Department of Veterans Affairs, noted that VA records reflected plaintiff had not sought treatment at the Popular Bluff VAMC since 1989. (Tr. 625.) In addition, plaintiff did not require prescription pain medications. (Tr. 98, 330, 419, 442, 614.) The ALJ was entitled to find this lack of significant medical attention and failure to require prescription medication inconsistent with a finding of disability. See Shannon v. Chater, 54 F.3d 484, 487 (8th Cir.1995); Barrett v. Shalala, 38 F.3d 1019, 1023-24 (8th Cir.1994); Miller v. Sullivan, 769 F.Supp. 1073, 1079 (E.D.Mo.1991). "A failure to seek aggressive treatment is not suggestive of disabling back pain." Rautio, 862 F.2d at *1463 179. Accord Chamberlain, 47 F.3d at 1495. Failure to seek treatment supports the ALJ's credibility determination. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir.1993).
It is also significant that plaintiff told Dr. Glenn in 1988 that he quit his work because he and his wife were having problems and he had not worked since 1984. (Tr. 199.) Inconsistently, plaintiff testified that he had quit (Tr. 60) and that he had been fired from his last job (Tr. 87-88). Courts have considered it significant when claimants leave work for reasons other than their medical condition. See, e.g., Weikert v. Sullivan, 977 F.2d 1249, 1254 (8th Cir.1992) (claimant's reason for leaving prior work was not due to fatigue, but to dissatisfaction with job assignments in one case, and in the other, the completion of the project he was guarding).
The Commissioner met her burden of showing that jobs existed in the national economy which plaintiff could perform during the relevant periods by utilizing vocational expert testimony which is substantial evidence in support of the decision. (Tr. 34-35.) See Vasquez v. Schweiker, 701 F.2d 733, 736 (8th Cir.1983). The vocational expert found that plaintiff had acquired skills transferable to other work. The Eighth Circuit Court of Appeals has held that a hypothetical question to a vocational expert need only include those impairments accepted as true by the ALJ. Hayes v. Chater, 73 F.3d 769, 771 (8th Cir. 1996); House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). Because the hypothetical questions included those limitations which the ALJ accepted as true, they were proper.
Substantial evidence on the record as a whole supports the Commissioner's decision that plaintiff was not disabled due to a mental or physical impairment on or before his insured status expired on September 30, 1986. However, the decision of the ALJ concerning plaintiff's eligibility for Title XVI benefits based on his mental condition is not based on substantial evidence on the record as a whole.
For these reasons, the final decision of the Commissioner denying disability insurance benefits is sustained, but reversed as to the denial of supplemental security income benefits.
NOTES
[1] The record indicates that plaintiff also filed applications on January 16, 1984, September 11, 1985, and on January 5, 1987, the results of which are unknown. (Tr. 158.)
[2] In his Title II application, plaintiff stated: "I agree with my earnings record. I did not work from 1973-1983. I have not worked since 1985. I do not plan on filing an Appeals Council review. I do not have an attorney at this time." (Tr. 515) Plaintiff has indicated he became unable to work on December 2, 1985 (Tr. 293) and on April 1, 1985 (Tr. 285).
[3] The initial denial is not contained in the record.
[4] A slight degree of paralysis, affecting the lower extremities. Stedman's Medical Dictionary 1136 (25th ed.1990).
[5] The physician's name is not clear from the record.
[6] Relating to a ligament of the muscles. Stedman's Medical Dictionary 870, 1015 (25th ed. 1990).
[7] In 1989, plaintiff told Dr. Sisler that he had served in the Army with overseas duty in Germany. (Tr. 322) In 1995, plaintiff indicated that his service records were mixed up because they did not show he had been in Vietnam. (Tr. 656).
[8] A systematized delusion is a delusion (a false belief or wrong judgment held with conviction despite incontrovertible evidence to the contrary) that is logically constructed from a false premise and embraces a specific sector of the patient's life. Stedman's Medical Dictionary 410 (25th ed.1990).
[9] Counsel argues that plaintiff's raw score of 60 on the Bender Gestalt placed him in the category of moderately severe organicity, citing Tr. 435. (Plaintiff's Brief at 10.) This page was not completed by Dr. Glenn and it is not clear from this scoring sheet what score, after correction, would apply to plaintiff or what category of organicity, if any, would apply. It is obvious from the score sheet that raw scores are not used.
[10] Upon advising the ALJ that she would have plaintiff see Dr. Niskey, plaintiff's counsel stated that Dr. Niskey would administer the MMPI and give a "read-out without  she doesn't do an indepth study or anything like that, but she will administer the MMPI and give us an analysis of the same[.]" (Tr. 125).
[11] Defendant states that it was actually the "F" scale that was elevated and that the "L" scale was within normal limits. (Tr. 654.)
[12] Dr. Moreland did find evidence of neurosis through chronic anxiety (Tr. 458) and Dr. Comeau indicated that plaintiff needed to be referred to a psychiatrist (Tr. 456).
[13] The record is not clear what applications were contained in the "file."
[14] A claim may also be reopened for any of eleven fact-specific reasons that do not apply in this case. 20 C.F.R. § 404.988(c)(1)-(11); 416.1488(c).
[15] Plaintiff points out that the collective raw score on the Bender Gestalt for the Means of Patient Population who have had some college is 45.6 (Tr. 438), which is thirteen points lower than plaintiff's score of 60 (Tr. 436). According to an article on the Bender-Gestalt test, which was attached by Dr. Glenn to his report, "there is some evidence to support the belief that [the scores] are correlated with seriousness of psychiatric illness, i.e., psychotics tend to make higher scores than neurotics." (Tr. 438.)