199 F.Supp.2d 928 (2001)
Summer S. MADDOX, Plaintiff,
v.
Larry G. MASSANARI, Acting Commissioner of Social Security, Defendant.
No. 2:00 CV 34 DDN.
United States District Court, E.D. Missouri, Northern Division.
August 29, 2001.
*929 Karen Kraus Bill, Law Office of Karen Kraus Bill, Columbia, MO, for plaintiff.
Wesley D. Wedemeyer, Office of U.S. Attorney, St. Louis, MO, for defendant.

MEMORANDUM
NOCE, United States Magistrate Judge.
This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying plaintiff's applications for disability insurance benefits and supplemental security income (SSI) benefits under, respectively, Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., and Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. The parties have consented to the exercise of jurisdiction by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).
Summer Maddox filed applications for disability insurance benefits and supplemental security income benefits on April 23, 1997, alleging disability from August 23, 1996, by reason of fibromyalgia, blurred vision, and affective mood disorder. (Tr. 56-58, 100-02, 190-211). The applications were denied initially (Tr. 52-55, 70-71, 85-88) and on reconsideration (Tr. 46-50, 68-69, 79-83).
*930 Following a hearing on January 27, 1998, an administrative law judge (ALJ) found that plaintiff, although suffering from certain enumerated impairments, retained the residual functional capacity to perform the full range of sedentary work. Finding the absence of non-exertional limitations upon the plaintiff's ability to perform the full range of sedentary work, and in light of her age and education, the ALJ determined that plaintiff was not disabled by application of the medical-vocational guidelines. (Tr. 15-23). Additional evidence was submitted to the Appeals Council to support plaintiff's request for review (Tr. 6, 10-11, 341-55), but the Council denied plaintiff's request. (Tr. 4-5). Thus, the decision of the ALJ became the final decision of the Commissioner.
In this proceeding the plaintiff challenges the ALJ's determination that she does not suffer from any non-exertional impairments which substantially reduce her ability to engage in the full range of sedentary work, and consequently, also challenges the ALJ's reliance on the medical-vocational guidelines in rendering his determination rather than seeking the testimony of a vocational expert. Relevant to the issues presented herein, the ALJ determined in his decision of June 26, 1998, that:
1. Plaintiff met the disability insured status requirements of the Act on August 23, 1996, the date plaintiff alleges she became unable to work, and continued to meet them through June 30, 1998.
2. Plaintiff has not engaged in substantial gainful activity since August 1996.
3. The medical evidence established that plaintiff suffers from obesity, fibromyalgia and myofascial pain syndrome, and a depressive disorder but that the impairments, singly or in combination, were not listed in nor were equivalent to one listed in the Commissioner's List of Disabling Impairments.
4. Plaintiff's complaints of disabling pain, fatigue and insomnia were not supported by the evidence and were not credible.
5. Plaintiff had the residual functional capacity to perform work, except for prolonged walking and standing or lifting more than 10 pounds and that there were no non-exertional limitations diminishing the full range of sedentary work.
6. Plaintiff was unable to perform her past relevant work of assembly line worker.
7. The Guideline Rules 201.27 and 201.28 direct a conclusion that in considering plaintiff's residual functional capacity, age, education, and work experience, plaintiff was not disabled.
8. Consequently, plaintiff was not disabled under the Act.
(Tr. 15-23).
The court must affirm findings of the ALJ that are supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir.1998). Substantial evidence is evidence of sufficient quality that a reasonable person would accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir.2000). In reviewing the record, the court may not make its own findings of fact or substitute its own judgment for that of the Commissioner. Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir.1992). Nevertheless, when the court reviews the record for substantial evidence, it must review the entire record and consider whatever detracts from the weight of the evidence invoked by the ALJ. Singh, 222 *931 F.3d at 451; Piercy v. Bowen, 835 F.2d 190, 191 (8th Cir.1987). See also Wilcutts, 143 F.3d at 1136-37. Thus, substantial evidence on the record as a whole requires the court to "take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts, 143 F.3d at 1136 (quoting Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir.1987)). However, reversal is not proper just because there is substantial evidence which might have supported an opposite result. Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir.1992).

Evidence Before the ALJ
At the hearing conducted on January 27, 1998, the plaintiff testified that she was 20 years old, single, lived with her parents, had a high school education, was 5'7" tall, and weighed between 270 and 280 pounds. (Tr. 30-31). She drove for approximately one hour to attend the hearing. (Tr. 42).
She testified that she had last worked from approximately September 1996 through February 1997 as a full-time assembly line worker for a manufacturer of bank vaults. In this job she was regularly required to lift 30 pounds. She tried to transfer to a different job with this employer, but was unable to do so. She quit because she was not able to physically work 40 hours per week and perform the lifting requirements. Prior to quitting, she had missed quite a few days of work and believed she was in danger of losing her job. While working 40 hours per week, she would go to bed when she got home. (Tr. 32-33, 39).
Plaintiff testified that she was disabled due to fibromyalgia. She stated that she takes Ultram which helps if she takes it three times per day, although that exceeds the recommended dosage. She cannot tell if her other medications help her. She does not have any side effects from her medications. (Tr. 33-35).
Ms. Maddox testified that she was unable to work because of sharp, constant pain in her sides and back. Ultram helps her "calm down," but the pain is always there. She also suffers from fatigue requiring her to try to lay down and relax three times per day from 30 to 60 minutes each, depending upon the severity of the pain. (Tr. 35-36). Working 40 hours per week would result in extensive pain. (Tr. 39). The pain in her back and sides also interferes with her sleeping, often waking her, and requires her to change positions. (Tr. 38).
Stress exacerbates her pain according to plaintiff. She testified that she once had difficulties with depression but did not feel she currently had such problems. (Tr. 39).
Plaintiff also complained of stiffness in her hands and that she suffers from headaches. She believed that her headaches were migraines and described them as on the right side above the right eye lasting for a couple of hours. Naproxen gives her some relief. She estimated that she has headaches once or twice a week. (Tr. 38).
She stated that her doctors had limited the amount of weight she can lift and told her not to work 40 hours per week because of her pain. (Tr. 36).
She had her gallbladder removed in 1996 in an effort to relieve her symptoms, but it did not help. (Tr. 33, 37).
She estimated that she could lift ten pounds. She can only sit for 15 or 20 minutes because of pain in her sides and back. She estimated that she could only stand 15 to 20 minutes before having to sit down. She suggested that she would have to shift positions often to become comfortable. (Tr. 36, 37).
During the day she sews, although that "gets to" her hands. She does some laundry, cleans the house a little, and generally does things as she is able to do them. She *932 reads, but tries not to watch too much television. (Tr. 40).
She testified that her current physician, Dr. Jones, wanted to send her to another specialist, a rheumatologist, to see if there was anything else that could be done for her, such as prescribing new medications. (Tr. 40-41).
After the hearing, the ALJ requested a general medical consultative examination, as well as a psychological evaluation. (Tr. 42-43).
In her application for disability benefits, plaintiff described the course of her illness as follows: in June 1996 she started experiencing severe pain in her side. The problem remained undiagnosed by several doctors, but gallbladder surgery was performed in September 1996 due to a family history of gallbladder problems. However, the pain, fatigue, and blurred vision continued, although plaintiff returned to work in November 1996. Testing continued by specialists on referral from her family doctor, including referrals to an orthopedist and a rheumatologist. She still remained undiagnosed in December 1996, when it was suggested that her problem was muscular. In January 1997, her family doctor put her on Prozac; however, this subsequently caused suicidal thoughts. The pain, fatigue, blurred vision, and depression continued. He then diagnosed her as suffering from fibromyalgia and myofascial syndrome and suggested that she quit her job because of the pain, depression and added danger due to blurred vision. (Tr. 210-11).
Plaintiff was seen by Lesli Jansen, M.D., in June 1996 for complaints of right upper quadrant pain. Plaintiff described the pain as occurring on and off for approximately one or two months. When the pain occurred, it lasted several hours. There was a family history of gallbladder disease. Medication for the pain was prescribed and a gallbladder ultrasound was planned. (Tr. 324).
Plaintiff was examined on June 26, 1996. The ultrasound was normal; however, the pain continued. She continued to deny nausea or emesis.[1] Chest x-rays appeared normal. (Tr. 323).
In July 1996, she was seen by Dr. Jansen for a sore throat, cough, postnasal drip, frontal headaches, and generalized malaise. She stated that her headache was worse with bending over. An antibiotic and decongestant were prescribed. (Tr. 323).
On July 30, 1996, Ms. Maddox was seen for complaints of vomiting and diarrhea. She reported that right side pain was gone but she was having occasional stabbing pains on the left when she became upset. Viral gastroenteritis, now resolved, was diagnosed, and she was permitted to return to work. (Tr. 322).
Dr. Jansen's medical notes of September 13, 1996, reveal that plaintiff was seen in the emergency room several days earlier for severe right upper quadrant pain that caused her to double over, associated with nausea. The pain was not necessarily associated with eating or movement, but deep breathing when lying down increased the pain. The doctor noted that prior gallbladder tests had been normal as well as other testing performed in the emergency room. Upon examination there was a very pronounced Murphy's sign[2] in the right upper quadrant. Right upper quadrant pain and gallbladder abnormality were assessed. (Tr. 322).
*933 The emergency room medical notes of September 9, 1996, reveal that plaintiff was admitted upon complaints of right flank pain radiating to the right abdomen and nausea. She reported that the pain was greater with deep breathing. Additionally, she reported waking with blurred vision and headaches. She reported starting a new job the previous week with a vault manufacturer; the job had lifting requirements of 30 to 40 pounds over her head. Upon evaluation, the symptoms were noted to be "clearly pleuritic" in nature. She related a history of intermittent headaches. Laboratory studies were negative. She was told to avoid heavy lifting and follow-up with her physician. (Tr. 293-300).
On September 16, 1996, plaintiff returned in follow-up with Dr. Gordon, whom she had last seen in the emergency room. She reported a "new pain which is completely different than the previous one." She stated that right upper quadrant pain awakens her from a sound sleep, followed by nausea and vomiting. Pain medication was prescribed and additional testing was planned. (Tr. 284).
On September 17, 1996, plaintiff was hospitalized for dehydration and symptomatic gallbladder dysfunction. She complained of right upper quadrant pain radiating to the back for 10 days, as well as nausea and vomiting for three days. Her gallbladder was removed. She was told to limit her activity, including heavy lifting. Pain medication was prescribed. (Tr. 277-83, 285-92).
On October 2, 1996, Ms. Maddox was seen for an open surgical wound, bruising, a "knot" near one of the incisions in the right upper quadrant, and shortness of breath and vomiting. She wanted to return to work in one week. An antibiotic and ibuprofen were prescribed. (Tr. 321).
On October 11, 1996, the wound infection was completely healed. She stated that her pain was improving on the right side and it was felt that her symptomatic gallbladder dysfunction was resolved with surgery. She was also diagnosed with an upper respiratory infection. (Tr. 321).
On October 23, 1996, plaintiff's mother reported that she had occasional complaints of right upper quadrant pain on lifting. Ibuprofen was recommended. (Tr. 321).
However, on November 11, 1996, plaintiff returned to Dr. Jansen reporting a three week history of right-side chest pain that was exacerbated by deep breathing, twisting, and lifting. She stated that the pain started when she returned to work full time. She was currently working 55 hours per week. There was tenderness on the right side and plaintiff was "quite tender" along the rib cage. The assessment was musculoskeletal pain, probably from chronic injury. An orthopedic consult was planned. Dr. Jansen believed that the pain was related to lifting and "certainly not related to her gallbladder or previous problem." (Tr. 320).
On November 11, 1996, plaintiff was seen by Jeffery Parker, M.D. Plaintiff reported minimal change in her symptoms since the removal of her gallbladder. She reported that her worst pain was in the right lower chest wall and started in her anterior chest and radiated into her right lower rib cage. She stated she has pain on deep breathing and with certain trunk movements. She bruised easily and had headaches, vision changes, and occasional dizziness. Her right posterior chest wall, lower ribs, and costochondral junction[3] anteriorly *934 on the right were tender to palpation. a neurologic examination was normal. The impression was right ill-defined chest wall pain which appeared to be musculoskeletal in nature. A bone scan and chest x-ray were planned. (Tr. 327-28). The results of these tests were normal. (Tr. 326, 331-32). Dr. Parker referred her back to her surgeon to make sure that her symptoms were not related to gallbladder disease.
She was seen by her surgeon on November 18, 1996. There was tenderness along the costal chondral[4] margins on the right side. It was very tender when he pressed and he believed it might be a costal chondritis[5] type of problem. He advised her to use heat and a mild pain reliever and he prescribed a steroidal dosepak. He did not believe that it was related to her gallbladder surgery. (Tr. 334).
Plaintiff returned to Dr. Parker on November 20, 1996, complaining of continuing pain in her chest with certain movements, breathing, or work. She stated that she was now experiencing similar pain on the left side. She showed marked tenderness of her chest wall on the right, especially in the costochondral region. The impression was possible inflammation of the costochondral rib margins or possible intrathoracic or intra-abdominal pathology which was causing her symptoms. A CT scan of the chest was planned with possible referral to a rheumatologist to treat the costochondritis. (Tr. 326). The CT scan was negative. (Tr. 330).
Ms. Maddox was seen by Daniel Jost, M.D., a rheumatologist, on December 9, 1996. Plaintiff complained of chronic headaches, weakness, fatigue, chronic cough, easy bruising, sun sensitivity, and tenderness in the right anterior chest as well as the mid-thoracic spine. Medications included Naproxyn, Inocin, Cataflam, and a Solu-Medrol dosepak. Tenderness on palpation was present along the eighth and ninth ribs on the right as well as around T10-12. There was no paraspinal spasm and no decreased range of motion. Dr. Jost believed the problem to be musculoskeletal with soft tissue pain. He did not believe that there was an inflammatory condition or inflammatory costochondritis. Physical therapy and rehabilitation were prescribed during which time she was not to work. (Tr. 308-09).
Plaintiff received five physical therapy sessions. She reported to the therapist that the pain began in April 1996 when she worked in a hospital and that, once she started her job on the assembly line, which required a lot of lifting, the pain progressively worsened. During the therapy sessions she complained of flu-like symptoms and stomach pain limiting the therapy performed. She was to contact the therapists after her next physician's appointment regarding continuing therapy. She failed to contact the therapists and she was discharged from therapy. Therapy goals were not met, except plaintiff had been given a home exercise program. (Tr. 310-18).
Dr. Jost saw plaintiff in follow-up on January 6, 1997. She had stopped smoking and had experienced a slight improvement in chest wall pain that lasted approximately one week. She currently had a virus and was coughing and complaining of increasing fatigue, chest pain and "overall ill-being." She had chest wall pain on palpation and right gluteal pain. Her *935 mother believed she had fibromyalgia, but Dr. Jost found some mild tenderness but no overt pain or fibromyalgia points. He believed that they might be dealing with fibromyalgia, but plaintiff did not show all of the criteria. He believed she suffered from "chronic pain, myofascial pain." Prozac was added to her medications; she was to continue exercising, lose weight, and return to work in one week. (Tr. 307).
At some point following prescription of Prozac, plaintiff was seen for one session with Patrick Finder, a psychologist. She reported the sudden onset of significant depressive symptoms including sadness, sleep and appetite disturbance, suicidal ideation, and feelings of hopelessness and helplessness. At the time of the interview she reported that these symptoms had dissipated with the cessation of Prozac. Finder believed that the depression was related to Prozac leaving her system. He did not believe that there was any impairment based upon "the one brief episode of depression." (Tr. 338-40).
On February 17, 1997, Dr. Jost believed that plaintiff suffered from fibromyalgia but that she had improved and was able to sustain a 40 hour work week. However, he believed that she should only occasionally lift, carry, push, or pull more than 30 pounds. He believed that she could return to work. (Tr. 306). However, on March 19, 1997, in a written statement, he said that throughout her evaluation and treatment, plaintiff "continued to have severe, disabling symptoms of fibromyalgia" and that her attempts to work had exacerbated her pain and she had quit working as of February 28, 1997. (Tr. 258).
In March 1997, plaintiff was seen by Justin Jones, M.D., for complaints of fibromyalgia. She complained of right-sided, low chest pain, a continual aching pain that felt like she had a "virus all the time." She described it as a sometimes jabbing pain in her right mid-back which felt like a muscle cramp. She reported that she was no longer taking Prozac because it made her "crazy" with suicidal thoughts that were now gone. She saw a psychiatrist and he thought it was possibly the side effects of Prozac. She further reported periodic blurred vision since the fall of 1996. She also complained of aching joints in her hands in the morning. There was mild tenderness in the upper quadrants bilaterally with no rebound or guarding. All trigger spots tested for fibromyalgia were positive. The control spot was negative for tenderness. Dr. Jones' impression was chronic chest pain believed to be fibromyalgia, chronic back pain also possibly fibromyalgia, arthralgia of the hands without active synovitis, mild depression but not presently suicidal, and asthma. Amitriptyline was prescribed. (Tr. 267-68).
Upon follow-up on April 7, 1997, plaintiff reported that she was doing better with the Amitriptyline but that stress exacerbated the fibromyalgia. Upon examination, her upper back was not very tender, but her lower back was tender as well as over the clavicles and elbows. She was not "as touchy" as at her last exam. The impression was fibromyalgia, improved but still symptomatic, and urinary tract infection. The dose of Amitriptyline was increased. (Tr. 265).
On April 28, 1997 plaintiff reported that her fibromyalgia was "doing better," but she still had right-sided pain at times. "[I]f she tries to do too much," there is pain. She was taking 100 mg. of Amitriptyline. Additionally, she reported intermittent headaches which started at the right posterior portion of her head and traveled up and over the right side of her head making her eye throb at times. Anaprox was prescribed for her headaches. She was to continue on 100 mg. of Amitriptyline, although she was advised that, if she had more bad days than good days, *936 she could increase the dosage to 125 mg. and then even as high as 150 mg. She thought she would be OK keeping it at 100mg. Dr. Jones believed that her fibromyalgia had improved with the current treatment. (Tr. 262).
On June 23, 1997, plaintiff reported to Dr. Jones that she currently had one headache per week, but they were becoming less frequent. Further, Anaprox worked "really well" and took care of her headache. However, her fibromyalgia was still very symptomatic. She had increased the dosage of Amitriptyline first to 125 mg. and then to 150 mg. without any relief. Her main pain was in the right side of the rib cage. Upon examination, there was very moderate to severe pain when pushing in on the interior rib cage and also moderate pain in almost every fibromyalgia point tested. She was referred to Dr. Ogrinc, a rheumatologist. (Tr. 260).
On August 12, 1997, plaintiff complained to Dr. Jones of the sudden onset of back pain while she was watching a baby. It radiated to the left side of her abdomen. Upon examination, there was marked tenderness along the left side of the back and rib cage. Wherever Dr. Jones touched, she seemed to wince and almost start to cry. The same was noted on the right, but plaintiff explained that the right side always felt like that. A mild urinary tract infection and back pain were diagnosed. The back pain appeared to be musculoskeletal, but Dr. Jones noted that it could be an exacerbation of fibromyalgia. (Tr. 239).
Plaintiff was seen by Dr. Maribeth Ogrinc on referral on September 17, 1997. Plaintiff reported that 150 mg. of Amitriptyline left her feeling too sedated. Ms. Maddox reported pain in most of the musculature of the upper back and even into the lumbar area. She denied having trigger point injections or taking anti-inflammatory medicine on a regular basis. She obtained relief with Naprosyn. She denied receiving physical therapy for fibromyalgia. She also stated that her vision occasionally blurred with close work. Her pain was more in the musculature than in the joints, although there was some pain on extreme ranges of motion of the shoulders. She demonstrated "exquisitely tender trigger points throughout the trapezius muscles, inner scapular muscles, the latissimus muscles and into the buttocks." Oruvail, Ultram, and Flexeril were prescribed. Amitriptyline (Elavil) was to be discontinued. Physical therapy was planned. The diagnosis was fibromyalgia, although Dr. Ogrinc wanted to do some testing to rule out the possibility of "another process occurring." (Tr. 251-53).
On October 29, 1997, Dr. Ogrinc evaluated plaintiff's status for purposes of a credit disability insurance claim. Dr. Ogrinc opined that plaintiff was disabled from performing any occupation, that plaintiff was released to physical therapy, and that it was unknown when plaintiff's restrictions would be lifted. (Tr. 250). However, there was obviously some confusion, because, even though Dr. Ogrinc stated that it was unknown when Ms. Maddox could return to work and that the number of hours per week she was released to return to work was "N/A," Dr. Ogrinc marked the category for sedentary work, as well as issuing an opinion as to how long plaintiff could stand, walk, sit, and drive in an eight-hour work day. (Tr. 249-50).
Plaintiff returned to Dr. Jones on December 21, 1997, stating that she was not happy with Dr. Ogrinc, because she could not keep track of the medication plaintiff was taking. Apparently, plaintiff did not like being taken off of Amitriptyline, because that helped her the most of any medicine, although it made her groggy. Upon examination, plaintiff was diffusely, mildly to moderately tender throughout the back and neck, and more so in the *937 lower areas. She reported that she was not depressed. The diagnosis was fibromyalgia. Paxil was prescribed and she was to continue with the medications prescribed by Dr. Ogrinc. Physical therapy was suggested, but she declined it due to her lack of finances. (Tr. 238).
On December 21, 1997, plaintiff was again seen by Dr. Jones for complaints of sharp low back pain triggered by bending over. The pain radiated down both hips. She reported that her fibromyalgia was better with Paxil, but she did not see where the Flexeril (cyclobenzaprine) provided any relief. There was some mild low back tenderness, and the range of motion of the low back was fair. The diagnosis was low back pain, which appeared to be a mild sprain, and fibromyalgia, which was a little better on Paxil. She was to wean herself off of Flexeril and exercises for the low back were given. (Tr. 237).
Russel M. Newton, Ph.D., a psychologist, examined plaintiff on March 12, 1998, at the request of the Missouri Division of Disability. During the interview, plaintiff reported that her pain was in her right side and its degree was six or seven on a scale of ten, although some days the pain may reach a ten. She reported that Ultram alleviated her pain for three to four hours, but she did not like to take Ultram because it relaxed her too much. She opined that lifting more than 10 to 15 pounds, twisting, and stretching increased her pain. She reported that she was scheduled for a vocational rehabilitation interview and did not want to be on disability. She listed her previous jobs as working at McDonald's, in food service for a local hospital, and at the vault assembly plant. She wanted to be able to work in an office or with electronics. Ms. Maddox stated that on a "good day" she may do laundry and wash dishes, but she did not vacuum. Her concentration was adequate. Her MMPI results were suspicious for a "fake good" profile, and she had a low ego strength score. The psychologist believed that she needed to be referred for psychological intervention. He diagnosed depressive disorder, pain disorder associated with both psychological factors and a general medical condition, chronic, and fibromyalgia. (Tr. 216-219).
Newton also evaluated plaintiff on her mental ability to do work related activities. He rated as "good" her ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors, maintain attention and concentration, understand, remember, and carry out simple and detailed job instructions, maintain personal appearance, behave in an emotionally stable manner, and relate predictably in social situations. He rated as "fair" her use of judgment, ability to deal with stresses, function independently, understand and carry out complex job instructions, and demonstrate reliability. (Tr. 229-30).
Plaintiff was seen by Jennifer Clark, M.D., on March 25, 1998, at the request of the Social Security Administration. Plaintiff complained of pain, aching across the neck, pins and needles between her shoulder blades, and stabbing pains in her back and anterior chest wall. She estimated that her degree of pain was eight to ten on a scale of ten. She also complained of fatigue, trouble sleeping, headaches, visual problems, nausea, cramping, and soreness. She stated that her hobbies were reading and sewing. She did not exercise, perform her physical therapy exercises, nor was she doing aerobic exercise which is "the mainstay for fibromyalgia." Although she acknowledged that exercises were very helpful to fibromyalgia, she stated that, generally, she did not have a lot of energy. Coughing, bending, kneeling, squatting, climbing stairs, doing overhead work, running, lifting, sitting, and standing exacerbated her pain. The best positions for *938 plaintiff were sitting in a soft chair and lying on her stomach.
She related that most of her pain occurred in the evening and at night. During the day she does not feel nearly so bad. Plaintiff estimated that she could stand for 15 minutes and sit for 30 minutes, but she did not know how far she could walk. Plaintiff indicated that she was in vocational rehabilitation and was hoping to get a bookkeeping or interviewing clerk type of job. She denied depression and did not appear to be depressed.
Dr. Clark noted that plaintiff "all but jumped off and jumped on" the examination table. She walked normally. There was a full range of motion in the cervical and lumbar spine, hips, shoulders, elbows, knees, and ankles. Straight leg raising was negative. She had 14 of 18 fibromyalgia tender points with numerous control points. Dr. Clark believed that the numerous other tender points which are often control points raised some concern about the validity of testing for fibromyalgia.
Dr. Clark believed that plaintiff's testing would more appropriately result in a diagnosis of myofascial pain syndrome, although the treatment for it and fibromyalgia are essentially the same. Dr. Clark believed that plaintiff would do much better if she were compliant with her regular aerobic exercise and home physical therapy exercise programs. Dr. Clark also diagnosed obesity.
Dr. Clark recommended that plaintiff be limited to light or sedentary work and that she only be allowed to lift 25 pounds occasionally and 10 pounds frequently due to her obesity, poor conditioning and myofascial pain. Dr. Clark recommended that plaintiff stand and walk for an hour at a time for a total of six hours in an eight hour day. She considered plaintiff's ability to sit to be unimpaired, although she recommended that frequent breaks would promote better comfort. She estimated that plaintiff should be required to sit no longer than one hour without interruption. Also due to obesity, poor conditioning, and myofascial pain, Dr. Clark recommended that plaintiff only occasionally be required to climb, balance, stoop, crouch, and kneel. There was no restriction on reaching, handling, feeling, pushing or pulling, or seeing according to Dr. Clark. She also recommended that plaintiff stay in a stable temperature environment, particularly with warmer temperatures, because this was generally better for myofascial pain. Further, with plaintiff's history of asthma, her ability to be exposed to dust was questionable, although plaintiff did not report any specific environmental allergens. (Tr. 220-28).
Dr. Jones referred plaintiff to Robert C. Burger, M.D., a neurologist, for complaints of intermittent numbness and tingling of the right leg from the knee downwards, of several months duration. The numbness occurred about twice per week and lasted several hours. She described a history of intermittent left arm numbness which resolved on its own. She could not identify any triggers or associated factors. She also reported intermittent blurred vision lasting approximately 30 minutes at a time and described intermittent right-sided, aching, throbbing headaches. She said that at times she was awakened at night by pain. Examination of the back revealed tenderness to palpation over both flanks. The impression was intermittent numbness and the plan was to obtain an MRI of the brain to rule out significant structural diseases of the brain as the cause for the numbness. (Tr. 341-42).
Beginning in October 1998, plaintiff began seeing Peggy Wanner-Barjenbruch, M.D., for treatment. On October 6, 1998, plaintiff stated that she was in pain all of the time. She described it as intermittently occurring in a small area of her midback *939 that felt like pins and needles. She also complained of bilateral back pain, radiating bilaterally, and severe knee pain. She also complained of headaches on her left side that go into her neck. She stated that she goes to bed at 9:30 p.m. and has trouble falling asleep. She gets up in the middle of the night for an hour and then returns to bed. She rises between 8:00 and 8:30 a.m. She cleans or does laundry and watches T.V. during the morning and then lays down for 30 minutes in the early afternoon. When she gets up, she crochets for up to three hours. She stated that she did not work and did not know what she could do; so, she was afraid to do anything. Plaintiff weighed 316 pounds. Dr. Wanner-Barjenbruch diagnosed fibromyalgia syndrome and poor sleep pattern. She recommended that plaintiff increase her exercise. She was prescribed Desyrel, directed to taper use of Ultram, and was told to either participate in water exercise or to walk 15 minutes per day. She was also advised to sign up for at least one night school course to see if she could function through school. (Tr. 347).
Plaintiff returned to Dr. Wanner-Barjenbruch on October 20, 1998, with complaints of severe pain. She reported that she was sleeping better with Desyrel, but she could not taper Ultram because of too much pain and inability to sleep. The doctor recommended increasing the Desyrel and cutting the Ultram dosage in half. She also reported a severe headache that required an extra dosage of Naprosyn. She requested the doctor to complete a disability form for payments on her truck. She weighed 319 pounds. The doctor's impression was migraine headache improved with Naprosyn, fibromyalgia with no improvement, sleep pattern improved, and exercise minimally increased. (Tr. 348).
On January 19, 1999, plaintiff reported more pain with the change in the weather, but "[o]therwise, she ha[d] no real complaints." She complained that her fibromyalgia was exacerbated because she was moving to Mexico, Missouri, and was moving a lot of furniture and doing work that she was not used to doing. She also complained of a headache that was relieved with Naproxen. She weighed 325 pounds. The impression was fibromyalgia with exacerbation secondary to increased activity. (Tr. 349).
Plaintiff was seen on March 10, 1999, with complaints of severe low back pain that radiated down her leg. It began while she was moving, but she did not lift anything heavy. She was also required to climb stairs in her new home which she was not used to; but, she did not climb them often. Weight gain of 10 pounds was noted. There were no complaints of headache. Plaintiff requested a medication for weight loss. There was lordosis[6] of the spine with tenderness over the LS spine with negative straight leg raising. The diagnoses were back strain, fibromyalgia without change, and obesity. Celebrex samples and a prescription were given. Information on Meridia was dispensed, although no prescription was written until plaintiff was certain she wanted to take it. She was also instructed in a Slim-Fast dieting plan. (Tr. 350).
At her next appointment, on April 27, 1999, plaintiff complained of severe pain. She thought Celebrex had helped and asked for a prescription. She also wanted a prescription for a weight loss medication. She continued to complain of severe fibromyalgia and the inability to exercise or work. She weighed 330 pounds. The diagnoses were severe fibromyalgia and morbid obesity. She was prescribed a medication for weight loss, but the record *940 does not reveal what was prescribed. (Tr. 351).
On June 17, 1999, plaintiff complained of a different kind of headache, one that was accompanied by blurred vision. The headache pain, described as the feeling when drinking extra cold liquids, lasted for about one minute and occurred 20 or 30 times per day. Also, the pain was diffuse, rather than localized on the right side. She reported that Naproxen helped her headaches. She reported undergoing a CAT scan of the head ordered by Dr. Berger. Plaintiff weighed 329 pounds. The cervical spine posteriorly was tender. The diagnoses were headache and cervical spine tenderness. An x-ray of the cervical spine was planned and Midran for headaches was prescribed. (Tr. 352).
Plaintiff was seen again on July 28, 1999, for complaints of skin bumps and rash. She reported that Celebrex helped her pain during the day but not at night. She weighed 326 pounds. The diagnoses were infected rash, probably chigger bites, and severe fibromyalgia. An antibiotic was prescribed. (Tr. 353).
In November 1999, plaintiff complained of a sore throat of one week's duration and skin bumps. Pharyngitis[7] and folliculitis[8] were diagnosed. On November 24, 1999, Dr. Wanner-Barjenbruch noted that plaintiff was "doing excellently" and "sleeping excellently." Plaintiff complained of severe pain in the morning. She felt "a little hung over in the morning." There was no weight loss nor complaints of headache. The doctor did not believe that the fibromyalgia was controlled, because plaintiff was not taking any pain medication in the morning. She was directed on adjusting her medication. (Tr. 355).
Plaintiff's list of medications, received at the hearing, indicated that she took Oruvail, Flexeril, and Ultram at night, and Paxil at noon. Additionally, she took one puff of albuterol daily and an azmacort inhaler only when needed. (Tr. 103-104).
Plaintiff's employment record included working as a cook, a crew trainer, and on the frontline at a McDonald's restaurant from May 1994 through December 1995. Further, she washed dishes from January 1996 through August 23, 1996, at Audrain Medical Center. Finally, she worked on a factory assembly line from August 1996 through February 28, 1997. (Tr. 105).
Plaintiff's mother confirmed that plaintiff "struggles every day with pain and fatigue." (Tr. 141, 182, 345). Her mother believed that she might be capable of part-time employment. (Tr. 182).
In a telephone conversation on May 19, 1997, plaintiff reported to the Social Security Administration that she did not feel that she was disabled because of depression or vision problems. She believed that Prozac caused her depression and that her vision problems occurred only occasionally. She believed that her pain from fibromyalgia was disabling. (Tr. 152).
In a pain report completed in May 1997, plaintiff reported that she would like some training in computer work but that she was financially unable to obtain the training. She indicated that she would be grateful for training for any job she was physically able to do. (Tr. 161).

Discussion
Plaintiff argues that the ALJ did not properly consider her non-exertional impairments, including psychological impairments, pain, and the inability to handle *941 temperature extremes or dust. Consequently, according to plaintiff, the ALJ erred in relying on the medical vocational guidelines rather than seeking the testimony of a vocational expert regarding the availability of jobs in the national economy that she could perform.
It was the duty of the ALJ to assess the credibility of plaintiff's subjective complaints and to determine their severity according to factors which include plaintiff's prior work record; the observations of third parties, including physicians; her daily activities; the characteristics of any pain actually suffered; any precipitating or aggravating factors; the dosage, effectiveness, and side effects of her medications; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984), vacated, 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974 (1986), adhered to on remand, 804 F.2d 456 (8th Cir.1986), cert. denied, 482 U.S. 927, 107 S.Ct. 3211, 96 L.Ed.2d 698 (1987); Burnside v. Apfel, 223 F.3d 840, 844 (8th Cir.2000). With other factors, the absence of objective medical evidence to support the subjective complaints may also be considered by the ALJ. Burnside, 223 F.3d at 844.
The ALJ may lawfully discredit testimony about subjective complaints based upon inconsistencies in the evidence as a whole. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir.1995). Often the important issue is not whether a claimant "is experiencing pain; the real issue is how severe that pain is." Burnside, 223 F.3d at 844 (quoting Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir.1991)). In this case, the issue is whether plaintiff's subjective complaints, including pain, are so severe that she cannot even perform sedentary work. The mere fact that working may cause pain or discomfort does not require a finding of disability. Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir.1989). Credibility determinations must be supported by substantial evidence. Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir.1992).
Plaintiff alleged disabling pain and fatigue. The undersigned concludes that, based upon substantial evidence, the ALJ lawfully discredited the disabling nature of these complaints. However, it is clear from the record, contrary to plaintiff's assertion, that the ALJ credited such complaints to the extent that they limit plaintiff to sedentary work.
The ALJ discredited the disabling nature of plaintiff's subjective complaints for a number of reasons, including the facts that plaintiff worked at the factory assembly plant after the alleged date of onset of disability; her daily activities did not suggest disabling pain; she had not been hospitalized or referred to a pain clinic for pain; she had not been compliant with recommended treatment; she was not taking narcotic medication for pain, nor was she taking medication for depression or insomnia; her participation in vocational rehabilitation suggested her belief, as well as that of others, that she can engage in some type of gainful activity; and she testified she could lift 10 pounds.[9]
Plaintiff alleges disability with an onset date of August 23, 1996. This is reportedly the date she left the dietary department of a hospital (Tr. 105), shortly after which *942 she started work on the assembly line. She worked there through February 1997, although she missed some work due to her hospitalization for gallbladder surgery and, according to her testimony, she progressively missed more time due to pain. "Evidence of employment during period of alleged disability is highly probative of a plaintiff's ability to work." Williams v. Chater, 923 F.Supp. 1373, 1379 (D.Kan. 1996); 20 C.F.R. §§ 404.1571, 416.971.
In finding that plaintiff could not return to her past relevant work on the assembly line, the ALJ recognized that this job, which required considerable standing, bending, and lifting, was too strenuous for plaintiff. However, the fact that plaintiff could perform this strenuous work, despite her subjective complaints, is some evidence that she could perform less strenuous work despite her subjective complaints. Further, plaintiff unsuccessfully attempted to transfer to a less strenuous job at LeFeBure, the vault manufacturer. This suggests that she believed she could perform less strenuous work and only quit because she could not perform the strenuous job to which she was assigned.
The ALJ also considered plaintiff's daily activities, including doing laundry, washing dishes, reading, and sewing, in discounting complaints of disabling pain. The ability to read and sew requires concentration which is inconsistent with disabling pain. The ability to do laundry and wash dishes evidences some ability to stand, lift, and carry despite claims of pain. See McGinnis v. Chater, 74 F.3d 873, 875 (8th Cir. 1996) (inconsistencies between subjective complaints and daily activities can be considered by ALJ to discredit subjective complaints).
The ALJ also considered plaintiff's medications, noting that the medication for pain was non-narcotic. Further, the record shows that plaintiff takes the medication mainly at night (Tr. 103-04) which is consistent with her testimony and statements to physicians that most of her pain is at night and the pain during the day is better. (Tr. 222). Lack of strong pain medication during the day, when plaintiff is most active, is inconsistent with complaints of disabling pain. Richmond v. Shalala, 23 F.3d 1441, 1443-44 (8th Cir. 1994) (lack of strong pain medication is inconsistent with complaints of disabling pain). Further, the medical evidence establishes that, while plaintiff may suffer from headaches, this pain is largely controlled by medication. Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir.1997) (if condition is controlled by treatment, then it is not disabling). At the hearing, plaintiff denied any side effects from the medication.
By limiting plaintiff to sedentary work (which is defined as lifting no more than 10 pounds at any one time; occasionally lifting or carrying articles such as docket files, ledgers, or small tools; occasionally walking or standing; and requiring no bending or twisting), the ALJ credited testimony that bending and lifting exacerbates her pain. 20 C.F.R. § 404.1567(a); Ownbey v. Shalala, 5 F.3d 342, 344 (8th Cir.1993). Thus, precipitating and aggravating factors were taken into account.
The ALJ could also take into consideration plaintiff's failure to exercise, which was prescribed by her treating and consulting physicians for controlling the pain of fibromyalgia. The failure to follow a prescribed remedial course of treatment without good reason is inconsistent with complaints of a disabling condition. Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998); Kisling, 105 F.3d at 1257. Plaintiff was repeatedly advised to exercise, given home exercises, and even told to just walk 15 minutes per day; she acknowledged that exercising was very helpful for fibromyalgia. (Tr. 221). There is no indication *943 that she has been compliant with the exercise program and she denied having a regular exercise program to Dr. Clark. (Tr. 221). While lack of finances may affect participation in physical therapy, it would not affect performance of the home exercise plan she was given or affect just walking. Her activities of doing laundry and cleaning house, and her testimony that she can stand 15 to 20 minutes suggest some ability to walk despite allegations of pain. Plaintiff explained to Dr. Clark she did not exercise, because she did not have a lot of energy, not because she was in pain.
Disabling pain is also inconsistent with the opinions of Dr. Jones and Dr. Clark. In February 1997, Dr. Jost believed plaintiff could return to work with only the limitation that she be restricted to lifting only occasionally, carrying, pushing, or pulling more than 30 pounds. In March 1998, Dr. Clark on consultation believed plaintiff was capable of light or sedentary work. Dr. Ogrinc's evaluation, which alternately supports complete disability and supports an ability to engage in sedentary work, is internally inconsistent.
Plaintiff complained of fatigue, testifying that she laid down three times per day for 30 to 60 minutes each time. (Tr. 35-36). This is inconsistent with her statement to Dr. Wanner-Barjenbruch on October 6, 1998, that she only laid down for 30 minutes once during the day. (Tr. 347). Further, no physician advised her to lay down during the day. Brunston v. Shalala, 945 F.Supp. 198, 202 (W.D.Mo.1996).
While plaintiff's mother corroborates plaintiff's complaints of pain and fatigue, it is apparent from the statements of her mother that she is concerned with her daughter's economic well being. (Tr. 182, 345). See Gaddis v. Chater, 76 F.3d 893, 895-96 (8th Cir.1996) (ALJ may discount subjective complaints because of economic motivation for qualifying for disability benefits). Further, plaintiff's mother thought that part-time employment might be possible. (Tr. 182). The Social Security regulations regard part-time work as substantial gainful activity. 20 C.F.R. §§ 404.1572(a), 416.972(a).
Plaintiff complains that the ALJ did not properly consider her mental or emotional impairments. Plaintiff has consistently denied disability because of depression. While her denials may not be conclusive, they may be considered. The record supports only one instance of depression, reasonably attributable to medication. Plaintiff alleges that Russel Newton, a psychologist, found her to be anxious, nervous, tense, high strung, jumpy, worrying excessively, and tending to have somatic symptoms. Even assuming that Newton specifically found that plaintiff possessed these characteristics, as opposed to reciting general traits among individuals scoring within a certain category on personality tests, such still does not establish disability. The mere existence of a mental impairment is not disabling. Dunlap v. Harris, 649 F.2d 637, 638 (8th Cir.1981). There must be evidence of a severe functional loss establishing an inability to engage in substantial gainful activity. Trenary v. Bowen, 898 F.2d 1361, 1364 (8th Cir. 1990); Stanfield v. Chater, 970 F.Supp. 1440, 1458 (E.D.Mo.1997) (where a claimant's mental or emotional problems do not result in a marked restriction of his daily activities, constriction of interests, deterioration of personal habits, or impaired ability to relate, they are not considered disabling). Indeed, plaintiff has held three different jobs, despite a personality which may tend toward nervousness, anxiety, etc. Even Newton did not consider her condition to preclude her from work-related activities. Not one physician has found significant restrictions *944 or limitations due to a mental or emotional impairment.
Plaintiff also argues that she has additional non-exertional limitations in the form of needing to be protected from temperature extremes and working in a dust free environment. Dr. Clark merely questioned the need for a limitation on exposure to dust just because of plaintiff's history of asthma, noting that plaintiff never mentioned any environmental allergens. (Tr. 223). Plaintiff has never complained of shortness of breath, allergies, asthma, other respiratory problems, or a sensitivity to temperature extremes to her physicians, nor in her application for disability benefits, or at the hearing. Other than Dr. Clark's consultative examination report, nothing of record suggests the need for environmental restrictions, and plaintiff has not previously suggested such a need. Any asthma appears to be well controlled by medications. Kisling, 105 F.3d at 1257 (if condition is controlled by medication, it is not disabling). None of plaintiff's treating physicians recommended temperate environments as a means of treating her pain. Thus, substantial evidence supports the ALJ's conclusion that plaintiff's ability to perform the full range of sedentary work was not substantially reduced.
Having lawfully discredited her subjective complaints and having determined, based upon substantial evidence, that there were no non-exertional limitations which diminished the full range of sedentary work, the ALJ could properly rely upon the medical-vocational guidelines to determine that plaintiff was not disabled. Carlock v. Sullivan, 902 F.2d 1341 (8th Cir.1990).

CONCLUSION
For the foregoing reasons, the court finds and concludes that the decision of the Commissioner is supported by substantial evidence. Accordingly, the Commissioner's decision is affirmed and the action is dismissed. An appropriate order is issued herewith.

JUDGMENT
In accordance with the memorandum filed herewith,
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the final decision of the defendant Commissioner of Social Security denying benefits to plaintiff Summer Maddox is affirmed and this action is dismissed.
NOTES
[1] Vomiting. Stedman's Medical Dictionary (25th ed.1990), p. 502.
[2] A sign which usually indicates that the gallbladder is tender, inflamed, irritated by the presence of gallstones, or otherwise abnormal. 4 J.E. Schmidt, M.D., Attorneys' Dictionary of Medicine and Word Finder, Vol. 4 at M-286 (2000).
[3] Anterior chest wall. 7 Ausman & Snyder's, Medical Library Lawyers Edition, § 19:16 at 509 (1991).
[4] Costochondral: Relating to the rib cartilages. Stedman's Medical Dictionary at 362 (25th ed.1990).
[5] Inflammation of one or more costal cartilages, characterized by local tenderness and pain of the anterior chest wall that may radiate, but without local swelling. Stedman's Medical Dictionary, id.
[6] Hollow or saddle back; backward curvature. Stedman's Medical Dictionary, at 894.
[7] Inflammation of the mucous membrane and underlying parts of the pharynx. Stedman's Medical Dictionary, at 1178.
[8] An inflammatory reaction in hair follicles. Id. at 603.
[9] The ALJ also discredited plaintiff's subjective complaints because plaintiff's "[p]sychological testing has indicated that the claimant has a profile of an individual who may be faking." (Tr. 20). The undersigned does not find this determination to be based upon substantial evidence. Russel Newton's report stated that plaintiff's profile "is somewhat suspicious for a `fake good' profile, in terms of denying any psychological issues." (Tr. 218). This suggests only that she may be faking a good psychological profile, denying the presence of any psychological issues, not that she is "faking" her subjective complaints.